The following appeal arises from the decision of the Mahoning County Court of Common Pleas sentencing appellant John Steven Gerish to death. For the reasons set forth below, the decision of the trial court is affirmed.
 I. FACTS
The record reflects that on May 2, 1991, Angela Richardson was driving her mother-in-law, Eva Thigpen, to her home on Dewey Avenue in Youngstown, Ohio. At the same time, appellant and his mother, Ann Gerish, were stopped on Dewey Avenue. Ms. Richardson had to stop her car and wait on the street since the road was blocked by appellant's vehicle. At that time, Ms. Richardson noticed that appellant and his mother were having an argument. Subsequently, Mrs. Gerish got out of her son's car screaming and entered Ms. Richardson's car. Mrs. Gerish stated to Ms. Richardson and Mrs. Thigpen that appellant had "beat me up and threw me down the steps."
Ms. Richardson then proceeded around appellant's vehicle and continued on Dewey Avenue to a Fast Check store on the corner of Dewey and South Avenue. Appellant followed Ms. Richardson to the store. Mrs. Gerish was seated on the passenger side of Ms. Richardson's car with Mrs. Thigpen situated in the middle of the front seat.
At the Fast Check, appellant pulled his car next to Ms. Richardson's car on the driver's side. Ms. Richardson exited her vehicle and attempted to enlist the help of a security guard who was in a car parked at the Fast Check. The security guard advised Ms. Richardson that he was off duty and that she should call the police. Ms. Richardson then observed a patrol car coming up South Avenue and attempted to flag the police car down without success. Ms. Richardson next ran into the Fast Check store to get help.
From inside the store Ms. Richardson watched the defendant get out of his car and walk around to the passenger side of her car to speak to his mother. Witnesses at the scene observed that appellant walked with a limp as he had a cast on his lower leg. The defendant then walked back to his car, retrieved a pistol from the front seat and turned to the driver's side of Ms. Richardson's car. At that point appellant raised the pistol, took aim and began shooting repeatedly into the interior of the car. Appellant then walked around to the passenger's side of Ms. Richardson's car and again shot repeatedly into the car. Finally, the defendant walked to his car and left the scene.
Mrs. Thigpen and Mrs. Gerish were both later pronounced dead at the scene. The cause of death was determined to be multiple gunshot wounds from the handgun of appellant, John Gerish. It was also determined that a total of eight shots were fired into the interior of the car, all of which struck either Mrs. Thigpen or Mrs. Gerish.
The events leading up to the death of Mrs. Thigpen and Mrs. Gerish were observed by three witnesses at the Fast Check store in addition to Ms. Richardson. Dwayne Anderson, an employee at the Fast Check, was scraping paint from the gas pump island in front of the store when he observed appellant talking to a woman on the passenger side of Ms. Richardson's car. He then saw appellant walk to his car, retrieve a gun, return to Ms. Richardson's car and begin shooting repeatedly on both the passenger's and the driver's side of the vehicle.
Antwan Spencer, a student on his way home from school, had been conversing with Dwayne Armstrong in the parking lot when appellant pulled his vehicle next to Ms. Richardson's car. He also witnessed appellant approach Ms. Richardson's car and shoot into both sides at its occupants.
Finally, Ms. Tracie Gutierrez happened to be driving north on South Avenue and was stopped at the traffic light at Dewey Avenue next to the Fast Check store. Ms. Gutierrez observed appellant talking to some people in a car in the Fast Check parking lot. Ms. Gutierrez then witnessed appellant walk to his car, pick up something from inside the car and return to Ms. Richardson's car. At that point, Ms. Gutierrez observed the defendant discharge the pistol first through the driver's side window of the car and then through the passenger's side window. Ms. Gutierrez testified that appellant's final shot into the interior of the vehicle was separated in time from all of the other shots. It appeared that appellant was lining up his hands as if to pick out his target.
After the shooting, appellant exited the parking lot in his vehicle and proceeded to the home of a friend, Kenneth Willis. Mr. Willis testified that appellant told him that it would be the last time they would party for a while because he had made a mistake. When appellant showed Mr. Willis the gun, Mr. Willis asked for the weapon and took it outside to the police who were surrounding the house. At the request of police officers, Mr. Willis re-entered his home and instructed appellant to go outside with his hands up. Appellant obeyed these instructions at which point he was placed under arrest by Youngstown Police officers.
While appellant was being transported from Mr. Willis' residence to the police department, he was read hisMiranda rights by Officer Helen Scott. Appellant indicated that he knew his rights as they had been read to him previously on numerous occasions. Thereafter, appellant made incriminating statements to the officers in the police car while being transported to the city jail. The record reflects that appellant not only admitted to shooting both his mother, Mrs. Gerish, as well as Mrs. Thigpen but went so far as to brag that he was able to kill two people at one time. Appellant indicated that his mother deserved to die because she was constantly nagging him. Additionally, appellant felt that Mrs. Thigpen had failed to mind her own business and as a result also deserved to be shot.
Upon arriving at the city jail, appellant was booked and transported to an interview room. During this time appellant remained handcuffed as the interrogating officers, Officer Blanchard and Officer McKnight, feared a physical confrontation with appellant. Apparently appellant was in an agitated state as he had engaged in a verbal altercation with a turnkey officer at the city jail. Upon arriving at the interview room, appellant was again read his Miranda rights by the investigating officers. However, the Miranda rights waiver form was not signed by appellant. The investigating officer testified that appellant could not sign the form since he was handcuffed during the interview.
At this point, the officers obtained an audio cassette recorder to record appellant's statements. On the tape appellant was again asked if he understood his constitutional rights. The officer stated that appellant shook his head yes, that he understood. In that the proceedings were being recorded, appellant was prompted to verbalize his response for the recording. Appellant followed these instructions and verbally indicated that in fact he understood his constitutional rights. Appellant then proceeded to provide the investigating officers with a verbal, recorded statement as to the events which had transpired that afternoon.
Based upon the evidence and statements collected, appellant was indicted on May 24, 1991. He was charged with two counts of aggravated murder, each with death and firearm specifications, as well as one count of having a weapon while under disability. A motion to determine competency was filed by defense counsel on June 4, 1991. Accompanied by this motion were also written pleas of not guilty and not guilty by reason of insanity to all charges levied. As a result, appellant underwent several evaluations to determine his competency to stand trial and his mental state at the time of the offense. On November 15, 1991, the trial court found defendant competent to stand trial. Subsequently, on February 11, 1992, appellant withdrew his plea of not guilty by reason of insanity while at the same time ordering his plea of not guilty to remain on the record.
Appellant also filed a motion to suppress his statements made to interrogating officers at the city jail. A hearing was held on this motion by the trial court on January 28, 1992. During the course of the hearing, the state provided testimony from both officers present during the recording of the statement. Additionally, testimony was offered from both arresting officers who transported appellant to the city jail from Mr. Willis' residence. Through this testimony the state established that all statements received were voluntary and not the result of any coercive acts. Furthermore, both the arresting officers and the interviewing officers testified that appellant appeared coherent and did not evidence signs of being under the influence of alcohol or drugs during their interaction.
Appellant attempted to counter the state's testimony by indicating that he had no recollection of making the statements or receiving the Miranda warnings. It was appellant's contention that he had ingested cocaine the evening before the shootings which interfered with his ability to appreciate his own actions. However, appellant did indicate to the prosecutor that he was aware that his failure to recall the relevant events increased the chance of having the recorded statements suppressed.
After reviewing the testimony presented, the trial court issued a judgment entry dated January 29, 1992, overruling appellant's motion to suppress.
Upon addressing pre-trial motions and completing voir dire, this matter proceeded to a trial by jury on May 19, 1992. At the conclusion of the state's case, appellant moved for a judgment of acquittal pursuant to Crim.R. 29. Appellant asserted that the state failed to establish the element of prior calculation and design and as such could not meet its burden of proof on the charges of aggravated murder. It was the trial court's decision to overrule said motion.
Appellant then proceeded with the presentation of evidence and testimony on his own behalf. At the conclusion of his presentation, appellant again moved for a judgment of acquittal which was again denied. After completing deliberations, the jury returned a unanimous verdict of guilt on the charged offenses.
Having returned a verdict of guilty on the two aggravated murder charges, the focus of the proceedings then turned to the mitigation phase to determine the appropriateness of a sentence of death. At the beginning of these proceedings on June 15, 1992, appellant motioned for a "post-verdict judgment of acquittal" requesting that a conviction of murder be substituted for the convictions of aggravated murder. The grounds for said motion were again that the state failed to prove the element of prior calculation and design. The trial court overruled this motion as well as appellant's motion to dismiss the death specification.
As a result, testimony and evidence were presented as related to the relevant aggravating circumstance and any mitigating factors which would weigh against the imposition of the death penalty. On June 17, 1992, the jury issued its recommendation that the sentence of death be imposed. The trial court agreed with the jury's determination and as such issued its order on June 23, 1992, sentencing appellant to death. This instant appeal was immediately filed by appellant.
Appellant alleges eight assignments of error on appeal, to wit:
ASSIGNMENT OF ERROR NO. 1
 APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHTS UNDER U.S. CONST., AMEND. VI AND XIV AND OHIO CONST., ART. I, § 10 TO A FAIR TRIAL WHEN THE COURT ARBITRARILY DENIED DEFENSE COUNSEL THE RIGHT TO INQUIRE INTO PROSPECTIVE JURORS' PREFERENCE FOR DEATH OVER THE OTHER SENTENCING OPTIONS.
ASSIGNMENT OF ERROR NO. 2
 THE TRIAL (sic) ERRED IN VIOLATION OF DEFENDANT'S FIFTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS UNDER THE UNITED STATES CONSTITUTION BY ADMITTING A STATEMENT MADE BY THE DEFENDANT WHEN HE WAS MENTALLY INCOMPETENT TO MAKE A KNOWING AND INTELLIGENT WAIVER OF HIS RIGHTS.
ASSIGNMENT OF ERROR NO. 3
 THE STATUTORY SCHEME FOR IMPOSING THE DEATH PENALTY IN OHIO VIOLATES THE STATE AND FEDERAL CONSTITUTIONS.
ASSIGNMENT OF ERROR NO. 4
 THE TRIAL COURT ERRED WHEN IT FAILED TO QUASH THE INDICTMENT DUE TO IRREGULARITIES IN THE SELECTION OF THE GRAND JURY, THEREBY DEPRIVING APPELLANT OF HIS RIGHTS UNDER U.S. CONST., AMEND. V AND XIV, AND OHIO CONST., ART. I, §§ 2 and 16.
ASSIGNMENT OF ERROR NO. 5
 JOHN GERISH SHOULD NOT BE EXECUTED IN THAT AT THE TIME OF COMMITTING THE OFFENSE, HE WAS NOT CAPABLE OF FORMING REQUISITE MENTAL INTENT TO COMMIT THE CRIME OF AGGRAVATED MURDER.
ASSIGNMENT OF ERROR NO. 6
 THE COURT ERRED IN FAILING TO GRANT DEFENDANT'S MOTION FOR ACQUITTAL UNDER OHIO CIV.R. 29 IN THAT THE STATE FAILED TO PROVE PRIOR CALCULATION AND DESIGN AS REQUIRED BY THE STATUTE.
ASSIGNMENT OF ERROR NO. 7
 THE COURT ERRED IN PERMITTING THE PROSECUTOR TO READMIT CERTAIN EXHIBITS FROM THE FIRST PHASE OF THE TRIAL AT THE MITIGATION PHASE.
ASSIGNMENT OF ERROR NO. 8
 CUMULATIVE ERROR THROUGHOUT THE TRIAL AND MITIGATION PHASE DENIED DEFENDANT HIS RIGHT TO A FAIR TRIAL IN VIOLATION OF U.S. CONST., AMEND. VI
AND XIV AND THE OHIO CONST., ART. I, § 10.
 II. ASSIGNMENT OF ERROR NUMBER ONE
In appellant's first assignment of error he alleges that he was denied a fair trial when the court arbitrarily denied defense counsel the right to inquire into prospective jurors' preference for death over other sentencing options. Furthermore, appellant alleges that the trial court erred in overruling a challenge for cause when a prospective juror did not appear to be impartial. Appellant's allegations relate specifically to two jurors empaneled in this case.
The first allegation concerns Juror Carolyn Hinrichs whereby the prosecutor's objection was sustained as to the inquiry into any feeling of an obligation to return a death verdict after a possible conviction. The following dialogue transpired:
 "Q. If you render a verdict of guilty, will you feel obligated to then later enter a verdict of death?
Mr. Philomena: Objection.
The Court: Sustained." (Voir Dire Tr. 953).
Later, the juror was further questioned by appellant's counsel as follows:
 "Q. Can you think of any situation where a life has been taken where you would not vote for the death penalty?
A. Self-defense.
Q. Okay. Any other situation?
A. No." (Voir Dire Tr. 955).
Appellant alleges that the above portions of voir dire demonstrate that the juror would automatically vote for the death penalty in every case where a defendant has been found guilty of murder. Furthermore, appellant finds error in the trial court's decision to sustain the prosecutor's objection, thereby limiting questioning as to the impartiality of a juror. Therefore, appellant requests that this court override appellant's sentence of death, citing the United States Supreme Court's decision in Morgan v. Illinois (1992), 504 U.S. 719.
The second juror in question is Joseph Frank whom appellant alleges was not capable of being fair and impartial based upon the following questioning during voir dire:
 "Q. * * * I know it's a difficult thing, and I don't know if I'm explaining it real well, but you want an explanation of why he killed these two people; am I correct?
 A. You don't have to give no explanation, coming from the defense.
Q. Right.
A. Okay.
 Q. But that's the explanation you want, is what you told me?
A. Right.
Q. That's what you're looking for?
A. Yes, I am." (Voir Dire Tr. 303).
Earlier Juror Frank was asked the following:
 "Q. Does it strike any particular cord in you that would strike you to say, 'This man's accused of that. I don't like him. I don't want to be in a room with him.' Anything of that nature?
 A. No it does not. It just makes you wonder why he would do that to his own mother. * * *." (Voir Dire Tr. 292).
Based upon these responses, appellant alleges that this juror was not capable of being fair and impartial.
 A. STANDARD OF REVIEW
On appeal, a trial court's ruling on a challenge for cause will not be disturbed "unless it is manifestly arbitrary and unsupported by substantial testimony, so as to constitute an abuse of discretion." State v. Williams (1997), 79 Ohio St.3d 1,8, citing State v. Wilson (1972), 29 Ohio St.2d 203, 211. Due to the trial court's ability to observe the demeanor and body language of prospective jurors, it is in the best position to determine whether the juror will in fact be impartial. Id. Furthermore, in the event a juror is not challenged for cause, he or she will be presumed to be impartial. State v. Broom
(1988), 40 Ohio St.3d 277, 288. By failing to challenge a juror for cause, a party waives any challenge to the juror's participation. See State v. Poindexter (1988), 36 Ohio St.3d 1.
 B. APPLICABLE LAW
In inquiring into a prospective juror's views on the death penalty, the United States Supreme Court has previously held that a juror who will automatically vote for the death penalty in every case "will fail in good faith to consider evidence * * * of mitigating circumstances as the instructions require him to do." Morgan, supra at 729. To impanel a juror with such views is tantamount to a violation of an individual's due process rights. In order to insure a fair and impartial trial, a trial court must permit sufficient questioning on the issue to discover any potential inability on a juror's part to properly weigh mitigating factors.
A proper inquiry during voir dire must constitute more than mere "general questions of fairness or impartiality" as such will not be sufficient to determine a juror's true beliefs on the subject. Id. at 735. Detailed questioning must occur beyond general questions of impartiality and fairness to guarantee that each juror is fully aware that the law requires a weighing of aggravating and mitigating circumstances prior to imposing the death penalty. State v. Wilson (1996), 74 Ohio St.3d 381,386, citing State v. Rogers (1985), 17 Ohio St.3d 174.
While detailed questioning must be conducted, this process does not require that the trial court permit any specific question as related to the death penalty so long as the inquiry is sufficient to ferret out juror bias. McQueen v. Scroggy
(C.A.6, 1996), 99 F.3d 1302, 1330. After all, the Constitution does not dictate "a catechism for voir dire." Morgan, supra at 729. "It would be a game of semantics, not law, to conclude that the failure to phrase a question in a specific way is fatal where other questions are equally illuminating." McQueen, supra. Furthermore, in reviewing the voir dire of any juror, it is appropriate and in fact necessary to review the entire voir dire to determine sufficiency. State v. Lundgren (1995),73 Ohio St.3d 474, 483.
 C. ANALYSIS
In that appellant failed to challenge Juror Hinrichs for cause, he has essentially waived any error committed by the trial court with the exception of plain error. However, assuming arguendo that this juror had been properly challenged, this court would still be compelled to find that Juror Hinrichs was qualified to sit on the jury.
In the case sub judice, the questions posed to Juror Hinrichs were more than mere general questions as to the juror's ability to be fair and impartial. Following are some of the questions posed to this juror relevant to the imposition of the death penalty:
 "Q. Can I ask, what are your views regarding capital punishment or the death penalty?
 A. I think it would depend on each individual case." (Voir Dire Tr. 904-905).
 "Q. * * * Do you understand that going in, those are the only three possible punishments that a jury can select from?
A. Yes." (Voir Dire Tr. 909-910).
 "Q. * * * Can you assure me that you will only consider those things as told to you by the Judge as being mitigating factors?
A. Yes." (Voir Dire Tr. 913).
 "Q. Mitigating factors might be something like the defendant's background and the defendant's character, things that the jury may want to consider to determine a diminished amount of punishment, to render less harsh, to render less severe, do you understand?
A. Right." (Voir Dire Tr. 913-914).
 "Q. * * * [t]his is the most serious you'll agree, because there is the possibility of a death penalty?
A. Right.
 Q. Now, you understand that that's not automatic; that there is a procedure that you go through to get there?
A. Yes." (Voir Dire Tr. 938).
 "Q. * * * [s]hould you be selected as a juror, * * * you will make sure that before it's done there is a damn good reason for it?
A. Right." (Voir Dire Tr. 939).
 "Q. * * * You'll be able to follow the law and understand that just because the prosecution may prove that there is murder, that this man does not have to die?
A. Right." (Voir Dire Tr. 940-941).
As is evident from these examples, the record is replete with questions which go specifically to the juror's ability to properly apply the law as related to the imposition of the death penalty. While appellant was not permitted to ask the desired question regarding the imposition of the death penalty, the myriad of questions on the issue which were permitted provided sufficient insight into the juror's impartiality and fairness.
Appellant further argues that the bias of Juror Hinrichs in favor of the death penalty is shown by her inability to think of situations where she would not impose the death penalty. The Ohio Supreme Court has had occasion to review this very issue in its decision in Lundgren, supra. In its decision, the Supreme Court determined that instances in which a juror could not, in the abstract, concoct scenarios in which the death penalty should not be imposed in light of multiple murders were irrelevant. Id. at 483. What was determined to be relevant was the juror's responses taken as a whole throughout the voir dire process. As noted by appellee, isolating this one question and answer is improper. In reviewing the voir dire of any juror, it is necessary to review the entire voir dire.
As discussed above, a review of the voir dire in its entirety indicates that Juror Hinrichs was capable of following the law as related to the imposition of the death penalty. None of her responses show a strong preference for the death penalty over other penalty options. In fact, it is this court's opinion that her responses are neutral and evidence a full understanding of her obligations as a juror. From the above, it is clear that the juror in question had expressed her ability to be fair and impartial.
In reviewing the voir dire of Juror Frank, it is again clear that appellant is in error in asserting that this juror should have been removed. Again, as in the case of Juror Hinrichs, we must look at the entire voir dire to determine if Juror Frank demonstrated an ability to be fair and impartial. SeeLundgren, supra.
The following questions and responses occurred during Juror Frank's voir dire:
 "Q. In Ohio there are three possible penalties. Okay? Over on the blackboard I have written them out (indicating). The first is life imprisonment with the eligibility of parole after 20 years. The second is life imprisonment with the eligibility of parole after 30 years. And the last is death by electrocution.
 Those are the three possible penalties, if and when a defendant is found guilty of aggravated murder with a death specification attached thereto, after having proven that beyond a reasonable doubt. Do you understand that?
A. I understand.
Q. Does that cause you a problem?
A. No, it does not.
 Q. Can you follow the instructions of law that the Judge would give you?
A. Yes." (Voir Dire Tr. 270-271).
 "Q. Therefore, the only way you would consider life with parole eligibility after 20 years or life with parole eligibility after 30 years would be if the State failed to prove beyond a reasonable doubt that the aggravating circumstances did not outweigh the mitigating factors. Do you understand that?
A. I understand." (Voir Dire Tr. 272).
 "Q. Because, you see, that's what the Judge is going to tell you that's what the law is, and can you tell me that even though you don't know the law, you can follow the law that the Judge gives you? And every time I am in a courtroom and I hear the Judge read the law to the jury, then I see reactions on jurors' faces, and sometimes that reaction is, 'Gee, I didn't know that was the law. I always thought it was something else.' But can you assure me that even when you hear the law and you thought it was something else, you will follow the law, even if you disagree with it?
A. Yes, sir.
 Q. Because that's the oath you're going to take. It doesn't say you will follow the law that you think applies. It says you will follow the law that the Judge gives you. Would you do that, sir?
A. Yes, sir." (Voir Dire Tr. 274).
 "Q. Okay. Do you understand that the State of Ohio has the burden of proving the Defendant guilty beyond a reasonable doubt?
A. Yes." (Voir Dire Tr. 276).
 "Q. Can you assure me you'll listen to everything that's said?
A. Oh, yeah.
 Q. You understand you have to determine this case only on what you hear in this courtroom?
A. Right." (Voir Dire Tr. 288).
 "Q. Now, the Judge has told you and the Prosecutor's told you John Gerish is charged with killing or causing the death purposely and with prior calculation and design of his mother Ann Gerish and Eva Thigpen. These are called aggravated murders. Now, besides that being something horrible and bad, the aggravated murder of two human beings and one of them being John's mother, does that hold any particular importance to you other than the normal that you would attach to an aggravated murder?
A. No." (Voir Dire Tr. 291-292).
 "Q. You're also going to hear about drug usage or abuses for that matter.
A. (Nods head.)
 Q. And should that testimony relate to John Gerish, is that going to further reenforce your belief that he killed these two people and that he's a very dangerous man?
 A. Well, I have to hear the circumstances." (Voir Dire Tr. 294).
 "Q. You're also going to see some really, really gruesome photographs. Gruesome photographs of two dead women. Blood's on them, bullet holes, autopsy photographs. I don't know if you can imagine what an autopsy photograph is, but it also shows us that type of thing. And now you wonder why he killed these people, and you got the racist remark and maybe some talk about drug abuse, and then all this on top of it.
 Now, wouldn't that be kind of enough to put you over the edge where you're going to believe this guy needs to be punished in one way or another?
 A. I don't — I haven't heard everything yet, so —" (Voir Dire Tr. 295).
 "Q. — or anything like that. I've got a job to do and a man to represent, so a lot of these things we really need to know. So wouldn't all these things just more and more convince you that this man needs to be punished?
* * *
 A. Like I say, I have to hear the facts first. I understand what you're saying, though.
 Q. Don't you think those would have an influence, the photographs, very gruesome photographs —
A. Not necessarily." (Voir Dire Tr. 296).
 "Q. Because my understanding is you didn't even think about the death penalty until we started bringing it up during this?
A. (Nods head.)
 Q. Mr. Frank, do you have a view on capital punishment?
A. No." (Voir Dire Tr. 297).
 "Q. The Prosecution has a burden, and that burden is proving John Steven Gerish of these charges beyond a reasonable doubt. Do you understand?
A. I understand." (Voir Dire Tr. 298-299).
 "Q. Okay. In our judicial system, that is not the way it works. The Defendant need only say, 'I am not guilty.' They do not have to explain anything to you.
A. (Nods head.)
Q. Now, do you think that's fair?
 A. Yeah, I think it's fair. I mean —" (Voir Dire Tr. 301-302).
 "Q. Why he killed these two people. And that's what I'm saying, we don't have an obligation to do that.
A. Okay.
 Q. And should we not do that, what are you going to do should the defense not explain why?
A. What am I going to do?
Q. Yes, sir.
 A. Listen to the defense and listen to the prosecution, the prosecuting attorney, and whatever the jurors have to do, that's when we'll talk about it." (Voir Dire Tr. 303-304).
The above excerpts clearly reveal that although Juror Frank stated he would like to hear an explanation from the defendant, he realizes the following: that the state has the burden of proof beyond a reasonable doubt; that the defendant did not have to put on any evidence; and that he, Juror Frank, must listen to all the evidence and follow the instructions of the trial judge. Appellant's attempts to take Juror Frank's statements out of context are not persuasive in light of the overall effect of the answers when considered in their entirety.
As was the case with Juror Hinrichs, the scenario with Juror Frank was previously addressed by the Ohio Supreme Court inLundgren, supra. In that case, a juror made known during voir dire his concerns as to whether the defendant was innocent. Id. Thus, there was a question as to the impartiality of that juror. Id. However, in reviewing voir dire in its entirety the Supreme Court determined that the juror's answers to numerous other questions indicated the juror's ability to set aside his opinions and consider only the evidence admitted at trial. Id. Recognizing that the state had the burden of proof and the defendant was not required to offer a shred of evidence or testimony indicated to the court that the prospective juror was impartial. Id.
In light of Juror Frank's voir dire when considered in its entirety, we must conclude that the trial court did not err in permitting him to sit on the jury panel. While he may have voiced a desire to hear an explanation from appellant, his responses to numerous questions posed by counsel indicated an understanding and ability to follow the law. Therefore, it cannot be determined that the trial court committed error. In that the trial court's decision to permit both Juror Hinrichs and Juror Frank to sit on the jury was supported by ample testimony and case law, this court cannot find that an abuse of discretion occurred.
Appellant's first assignment of error is without merit.
 III. ASSIGNMENT OF ERROR NUMBER TWO
Appellant next alleges that his statement to the police should have been suppressed since he was mentally incompetent to intelligently and knowingly waive his Miranda rights. Specifically, appellant refers to the following portion of his recorded statement to the interrogating officers:
 "BLANCHARD: OKAY, JOHN DO YOU UNDERSTAND THAT? YOUR CONSTITUTIONAL RIGHTS.
SILENCE
BLANCHARD: YOU'LL HAVE TO ANSWER YES.
GERISH: YEAH (sic).
 BLANCHARD: OKAY, DO YOU HAVE ANY QUESTIONS ABOUT YOUR CONSTITUTIONAL RIGHTS?
SILENCE
 BLANCHARD: IS THERE ANY QUESTIONS ANYTHING YOU DON'T UNDERSTAND ABOUT WHAT I JUST READ TO YOU?
GERISH: ABOUT WHAT YOU JUST READ TO ME?
BLANCHARD: YEAH, DO YOU HAVE ANY QUESTIONS?
GERISH: DO I HAVE ANY QUESTIONS?
BLANCHARD: RIGHT (sic).
GERISH: YEAH (sic).
BLANCHARD: OKAY, WHAT'S YOUR QUESTION?
 GERISH: WAWAWHY DO I HAVE TO BE VERBALLY ABUSALIZED (sic)." (Tr. Taped, pp. 1-2).
Appellant alleges that his responses to these questions demonstrate his lack of understanding of his constitutional rights. Appellant further states that he was never questioned concerning his consumption of alcohol, Xanax (a prescription drug), or any other drugs prior to the time of the murders, and that appellant's statements show a "total lack of coherence."
Finally, appellant points to the testimony during the mitigation phase of the trial of two psychologists as proof of his lack of competence. Dr. Wayne Graves testified in part that, "at the time that John committed these offenses, he was suffering from a number of emotional disorders, which in combination, I believe substantially reduced his ability to conform his conduct to the requirements of the law."
Appellant also cites to the written evaluation of Dr. Michael Hartings which states in part:
 "* * * [a]t the time of the instant offense he experienced a significant diminishment in his ability to appreciate his circumstances, organize and plan his behavior, or control the release of aggressive impulses. The killing of his mother and her companion was an aggressive, impulsive, and spontaneous behavior, characterized by disinhibition, explosiveness, and lack of specificity. Given his history of severe disability in almost every phase of life, combined with significant behavioral, psychologic, and mental pathology, it is the opinion of this examiner that his liability for this crime is proportionately diminished and that life imprisonment is more appropriate to his mental status than capital punishment." (Evaluation by Michael H. Hartings, Ph.D., p. 6).
Appellant believes the evidence showed that he did not understand his rights or what he was doing at the time and hence, his statements to the police should have been suppressed.
 A. STANDARD OF REVIEW
During a suppression hearing, the trial court assumes the role of trier of fact. As such, it is responsible for the weighing of evidence and evaluation of the credibility of witnesses. State v. Mills (1992), 62 Ohio St.3d 357, 366. On appeal, an appellate court must defer to the factual findings of the trial court so long as they are supported by competent, credible evidence. State v. Harris (1994), 98 Ohio App.3d 543,546; State v. Klein (1991), 73 Ohio App.3d 486, 488. Therefore, the role of the appellate court is to review the record to assure sufficient evidence exists to support the trial court's ruling and that the trial court properly applied the law to said evidence.
 B. APPLICABLE LAW
In determining whether an accused's statement should be suppressed, a trial court must decide whether a voluntary, intelligent and knowing waiver of the individual'sMiranda rights occurred prior to making the statement. Whether a statement was made voluntarily and whether an accused voluntarily, knowingly and intelligently waived his right to counsel and right against self-incrimination are distinct issues. However, both are measured by the "totality of circumstances" standard. State v. Clark (1988), 38 Ohio St.3d 252,261. See, also, State v. Eley (1996), 77 Ohio St.3d 174,179.
In order for a waiver of rights to be viewed as being intelligently and knowingly made, it must be determined that the waiver was made with full awareness of the nature of the rights being waived and the consequences of the decision to abandon them. Colorado v. Spring (1987), 479 U.S. 564, 573. However, a criminal suspect need not know and understand every possible consequence of a waiver in order for it to be effective. Id. at 574. So long as the circumstances surrounding the interrogation reveal the requisite level of comprehension on behalf of the accused, the trial court may conclude thatMiranda rights were properly waived. Id.
On numerous occasions the Ohio Supreme Court has had the opportunity to provide guidance on when an accused may be viewed as competent to knowingly and intelligently waive his rights. In State v. Edwards (1976), 49 Ohio St.2d 31, it was determined that a defendant with a low I.Q. and a reading capacity at a second grade level knowingly and intelligently waived his rights after indicating that he understood the rights read to him by a police officer. It was further found that a defendant's mental retardation and illiteracy did not interfere with the ability to make a knowing and intelligent waiver of rights. State v. Hill (1992), 64 Ohio St.3d 313. InState v. Slagle (1992), 65 Ohio St.3d 597, it was also held that despite the accused's statements that he was under the influence of drugs and alcohol at the time of the waiver, police testimony regarding the accused's coherence could substantiate a conclusion that a knowing and intelligent waiver occurred. Finally, the United States Supreme Court decided inColorado v. Connelly (1986), 479 U.S. 157 that despite the fact that the accused suffered from "command hallucinations" which interfered with the ability to make free and rational choices, defendant's waiver would still be viewed as being valid.
 C. ANALYSIS
The transcript of the suppression hearing of January 28, 1992, sheds light on the appropriateness of the trial court's decision to overrule appellant's motion. Testimony presented at the hearing indicates appellant was read his rights on three separate occasions. The first occasion was in the police cruiser as appellant was being transported to the police station. Officer Bridges testified in part to the following:
 "Q. In the process of transporting him, did the Defendant say anything to you?
A. Yes.
Q. And do you recall what he said?
 A. He began — he was cursing. And he was using lot (sic) of profanity. Then we asked him did he know what he had done. He said, yes. And at that time I told my partner, I said: Before you say anything, read him his rights.
Q. What did you do at that time to your partner?
 A. I went in my hat and — I had my rights in my hat, gave them to my partner, told her to read him his rights." (Motion Tr. 40).
"Q. Is this the card you handed to your partner?
A. Yes.
Q. Were you driving the cruiser or your partner?
A. I was driving.
 Q. For that reason you instructed her to read these to the Defendant?
A. Right.
Q. In your presence did she read them?
A. Yes.
 Q. And without enumerating those rights, after those were read, did the Defendant make any statements to you?
A. Yes, he did.
 Q. Tell the Court, if you remember, what statements the Defendant made after being read those rights?
A. He said —" (Motion Tr. 41).
"Q. Do you recall what the Defendant said?
 A. He said he understood his rights because they had been read to him before.
 Q. Did he make any statements concerning the activities of the today? (sic)
A. Yes, he did." (Motion Tr. 42).
 "Q. Well, then you don't have to. Tell me what he said?
 A. He just said he understood his rights. I said: We have to read you your rights. He said he had been read his rights before. He had went through this situation before. We (sic) just doing our job reading you your rights. Then he said: Is she dead?
 Q. And do you recall if there was any response to that or any further statements made by him?
 A. He asked us was she dead. He said: The bitch deserved to die. We said: There was two women in the car, sir. He said the black woman didn't have to be there. If she had been minding her own business. Then he said he shot them both.
 Q. That was the statement he made in your cruiser in the process of being transported to the jail?
A. Right." (Motion Tr. 43).
Officer Scott substantiated the above dialogue with appellant in her testimony at the hearing on the motion to suppress. Detective Blanchard also testified that he and his partner, Detective Sergeant McKnight, had read appellant hisMiranda rights on two occasions. (Motion Tr. 4). On the first occasion Detective Blanchard testified that the following occurred:
 "A. * * * Mr. Gerish was asked if he understood the rights, if he had any questions. He indicated he did not. * * *." (Motion Tr. 5).
Although the waiver form was not signed by appellant, Detective Blanchard testified that the reason was, "so that we would not have to potentially fight him," since Mr. Gerish was "somewhat upset." (Motion Tr. 6). Later, prior to Detective Blanchard's recording of appellant's statement, Detective Blanchard testified, "I again advised him of his rights." (Tr. Motion 13). Detective Blanchard then testified that when appellant was asked if he understood his constitutional rights, that he nodded his head "yes." (Motion Tr. 19-20). Appellant testified at the hearing that he knew his rights although, "I don't remember them being read to me on May 2 at the police station." (Motion Tr. 101).
While appellant alleges that he was not coherent and any possible waiver was not intelligently made, the following excerpts of the testimony of the police officers made during the suppression hearing indicate otherwise:
 "Q. Now, when the Defendant was brought in to the interrogation room, do you know who brought him in?
A. Detective McKnight and myself.
Q. Was he able to walk?
A. Yes.
Q. Was he hysterical?
A. No.
 Q. Can you tell the Court or explain the demeanor you observed on him that day at that time?
 A. Mr. Gerish was in upset condition. He was somewhat emotional. I would not term him to be hysterical. He was coherent, understood my questions and he answered them and he came out with an understandable and coherent version of the events that transpired.
 Q. All right. At least as far as you could see that day, he was able to walk?
A. Yes.
Q. He was able to sit?
A. Yes.
Q. Did not fall to the ground?
A. No.
Q. He was able to answer questions?
A. Yes, he was.
Q. Able to verbalize responses?
A. Yes.
Q. He was not hysterical?
A. No.
Q. Was he shaking?
A. No." (Motion Tr. 7-8).
 "Q. You also indicated, I believe, on your direction, did you not, Mr. Gerish gave what you considered a coherent statement?
A. Yes.
 Q. Would you agree with me that during the taped interview we just heard Mr. Gerish's speech was slurred?
 A. No, I would not necessarily agree with that, counselor. That is how Mr. Gerish was talking. * * *." (Motion Tr. 28).
 "Q. Now, when you first saw Mr. Gerish, was his speech slurred?
A. When I first saw him?
Q. Yes.
 A. He was talking. I don't recall his speech being slurred." (Motion Tr. 48).
 "Q. Your observations of the Defendant, did he behave in a bazaar (sic) way?
A. No. He was very calm.
 Q. Very calm. Was he able to obviously did follow your commands?
 A. Yes. He listened very well, you know. But when he talked, he would just talk constantly. He listened.
 Q. He was able to understand what you told him to do?
A. Yes.
 Q. He was able — he answered questions you put to him?
A. Yes.
Q. When you told him to sit down, he sat down?
A. Right.
Q. Told him to lie down, he'd lie down?
A. Yes.
 Q. You told him to put his hands up, he put his hands up in the air?
A. Yes.
Q. He did follow your commands?
 A. He followed every command we gave him with no hesitation, no — didn't argue, didn't do anything.
Q. Was he hysterical?
A. No." (Motion Tr. 69-70).
 "Q. The statement Mr. Gerish gave you on May 2, did you consider him to be coherent at the time he gave the statement?
A. Yes, sir." (Motion Tr. 82).
The following testimony was provided by appellant:
 "Q. Had you had — had you had any alcohol in the 48 hours before you were arrested?
 A. No; because I — I haven't had a drink — then it was — I had been dry for 14 months, because they told me I had to quit drinking.
Q. So you had no alcohol?
A. No." (Motion Tr. 93).
There also was no evidence that appellant had taken any illegal drugs on the day of the shootings. While appellant indicated at the hearing that he ingested a large amount of cocaine the day before the shootings, this testimony is refuted by medical records reviewed by Dr. Graves. Dr. Graves testified during the mitigation phase of the trial that appellant was taken to Woodside Hospital for a psychiatric evaluation on the day of his arrest. Dr. Graves testified that a review of the admissions records from the hospital revealed that appellant indicated upon being admitted that he had not used alcohol for fifteen months and had not been using drugs.
Under the totality of the circumstances, it must be concluded that the trial court did not err in finding that appellant made a knowing and intelligent waiver of his constitutional rights and that his confession to the police was voluntarily and competently made. While appellant argues that drug use prior to the shootings reduced his ability to make an intelligent waiver of rights, this self-serving testimony is found to be unpersuasive in light of the overwhelming evidence and testimony contrary to appellant's position. It was well within the trial court's province to conclude that the testimony from four police officers was more credible than that of appellant. Additionally, as the record clearly reflects, appellant was read his rights on three different occasions. Upon being read his rights, appellant stated that he understood his rights as they had been read to him on prior occasions. Furthermore, appellant indicated that while he did not recall being read his rights, he did know what they were.
The arresting officers as well as the interrogating officers testified that appellant was coherent and followed all orders given to him. No evidence was presented which would lead to a conclusion that appellant was confused or disoriented. Appellant cites to a portion of his statement which he feels is indicative of his lack of understanding. However, when read in conjunction with the rest of the statement and in light of the circumstances, it is clear appellant was only inquiring into why he was verbally accosted by a jail turnkey. The evidence and testimony provided does not lend itself to a finding that appellant was unaware of his rights or the consequences of waiving them.
Although appellant takes issue with the fact that theMiranda waiver was not signed, the Ohio Supreme Court has previously determined that an express written waiver is neither necessary nor sufficient to establish waiver. State v. Scott
(1980), 61 Ohio St.2d 155. It has been determined that the question is not one of form, but whether defendant in fact knowingly and voluntarily waived his rights. Id.
In light of the above discussions and pursuant to the evidence and testimony of record, the trial court had sufficient competent and credible evidence to find that appellant knowingly and intelligently waived his rights.
Appellant's second assignment of error is without merit.
 IV. ASSIGNMENT OF ERROR NUMBER THREE
Appellant next alleges that the statutory scheme for imposing the death penalty violates the Ohio and United States Constitutions. For clarity, this court is dividing appellant's argument into the following allegations:
 1. Capital punishment is not the least restrictive means to further a compelling governmental interest;
2. Capital punishment is cruel and unusual;
 3. Prosecutorial charging discretion is inappropriately controlled and capital indictments are arbitrarily issued;
 4. Appellant is denied effective assistance of counsel since:
 a. In a two phase trial, if a defendant is convicted, the conviction destroys the credibility of counsel and diminishes counsel's effectiveness at the penalty phase),
 b. The extensive voir dire necessary in a death penalty case requires counsel to talk about the death penalty before any evidence is presented, and
 c. R.C. 2929.03(D)(1) requires that once a defendant requests a mental exam, that defendant has no control over the distribution of the results to the jury;
 5. The use of the same jury for both the guilt and the penalty phase of the trial deprives appellant of his right to an impartial jury;
 6. Requiring that aggravating circumstances outweigh mitigating factors violates the Ohio and United States Constitutions;
 7. There are no specific or detailed guidelines in the mitigating circumstances section of the Ohio Revised Code for the jury's use nor are there clear and objective standards;
 8. Ohio's death penalty statute fails to provide for distinguishing life and death sentences;
 9. There is a fundamental flaw in the proportionality review;
 10. The jury's recommendation of life is binding but documentation should be required setting forth the mitigating factors found and the reasons one factor or factors outweigh the others;
 11. The Ohio Revised Code requires only minimal information to be reported to the Supreme Court for appellate review;
 12. Ohio's death penalty statute does not require inquiry into the possible influence of passion, prejudice, or any other arbitrary factor;
 13. Ohio's law is flawed since it precludes a mercy option as a mitigating factor.
In State v. Poindexter (1988), 36 Ohio St.3d 1, 3, the Ohio Supreme Court specifically granted appellate courts the authority to summarily dispose of issues of law which have previously been decided by it in capital cases. Nonetheless, this court shall address each constitutional challenge and delineate the authority which renders each issue meritless.
Appellant's argument that capital punishment is not the least restrictive means to further a compelling state interest has been rejected by the Ohio Supreme Court in State v. Jenkins
(1984), 15 Ohio St.3d 164, 168, citing Gregg v. Georgia (1976),428 U.S. 153. The United States Supreme Court previously stated that, "* * * the decision that capital punishment may be the appropriate sanction in extreme cases is an expression of the community's belief that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death. Gregg, supra at 184.
Appellant's argument that capital punishment is cruel and unusual has also been rejected by the Ohio Supreme Court inJenkins where the Court again cited to Gregg and stated at page 187, "we hold that the death penalty is not a form of punishment that may never be imposed, * * *."
Appellant's argument that Ohio's death penalty law provides no control over the prosecutor's charging discretion and that capital indictments are arbitrarily issued was also addressed by the Ohio Supreme Court in Jenkins. This decision again relies upon the reasoning in Gregg for its determination that appellant's argument has no merit.
The relevant portion of the Gregg decision quoted by the Ohio Supreme Court states as follows:
 "First, the petitioner focuses on the opportunities for discretionary action that are inherent in the processing of any murder case under Georgia law. He notes that the state prosecutor has unfettered authority to select those persons whom he wishes to prosecute for a capital offense and to plea bargain with them.
* * *
 Petitioner's argument that prosecutors behave in a standardless fashion in deciding which cases to try as capital felonies is unsupported by any facts. Petitioner simply asserts that since prosecutors have the power not to charge capital felonies they will exercise that power in a standardless fashion. This is untenable. Absent facts to the contrary, it cannot be assumed that prosecutors will be motivated in their charging decision by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts. Unless prosecutors are incompetent in their judgments, the standards by which they decide whether to charge a capital felony will be the same as those by which the jury will decide the questions of guilt and sentence. Thus defendants will escape the death penalty through prosecutorial charging decisions only because the offense is not sufficiently serious; or because the proof is insufficiently strong. This does not cause the system to be standardless any more than the jury's decision to impose life imprisonment on a defendant whose crime is deemed insufficiently serious or its decision to acquit someone who is probably guilty but whose guilt is not established beyond a reasonable doubt. Thus the prosecutor's charging decisions are unlikely to have removed from the sample of cases considered by the Georgia Supreme Court any which are truly 'similar.' If the cases really were 'similar' in relevant respects, it is unlikely that prosecutors would fail to prosecute them as capital cases; and I am unwilling to assume the contrary. Id. at 225.
 Moreover, as recognized by Justice White in his concurring opinion in Gregg, appellant's argument represents an indictment of our entire criminal justice system which must be constitutionally rejected." Jenkins, supra at 169-170.
Furthermore, the argument that uncontrolled discretion of prosecutors in indictment decisions allows for arbitrary and discriminatory imposition of the death penalty has specifically been rejected by this court in State v. Hudson (May 28, 1993), Jefferson App. No. 88-J-40, unreported, (reversed on other grounds).
Appellant also alleges that the use of one jury to determine both guilt and penalty violates his right to a fair and impartial jury as well as his right to effective assistance of counsel. This issue was fully addressed and rejected by the Ohio Supreme Court in State v. Mapes (1985), 19 Ohio St.3d 108, where the court reasoned:
 "R.C. 2945.25(C) permits challenge for cause in a capital case if a venireman 'unequivocally states that under no circumstances will he follow the instructions of a trial judge and consider fairly the imposition of a sentence of death in a particular case.' This statute finds its origin in Witherspoon v. Illinois (1968), 391 U.S. 510, wherein the Supreme Court stated that prospective jurors may be excluded for cause when it is unmistakably clear that they will automatically vote against the death penalty without regard to the evidence or that their attitudes toward the death penalty will prevent them from making an impartial decision. Appellant argues that the process of 'death-qualifying' jurors that sit for the guilt phase of a capital trial violates the rights of equal protection and due process because such jurors are not representative of a fair cross-section of the community and are conviction prone.
 This argument was addressed in State v. Jenkins, supra, in which we noted that * * * 'death-qualify[ing] a jury prior to the guilt phase of a bifurcated capital prosecution does not deny a capital defendant a trial by an impartial jury.' This holding controls the issue as raised in this case.
 Appellant also argues that the use of the same jury at the guilt and penalty phases of his trial violated his right to trial by a fair and impartial jury and his right to effective assistance of counsel. Appellant argues that the jury did not fairly and impartially view him during the penalty phase because it had convicted him during the guilt phase and that appellant's counsel was not effective during the penalty phase for the same reason. These arguments were also rejected in State v. Jenkins where we stated:
 'Appellant also submits that since the same jury which convicted him also sentenced him, he was denied a fair and impartial jury as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, as well as Sections 10 and 16, Article I of the Ohio Constitution. Appellant illustrates this contention by arguing that if defense counsel pursues a defense at the guilt phase of a capital trial which affects defendant's credibility, then his credibility is diminished at the sentencing stage. Suffice it to say that although the Supreme Court has endorsed bifurcated proceedings in death penalty cases, see Zant v. Stephens, * * * [(1983), ___ U.S. ___, 77 L.Ed.2d 235] at 248, the court has yet to even remotely suggest that the Constitution requires a new jury be selected for the sentencing phase. Accordingly, we are unable to accept appellant's contention.' " Id. at 116-117.
Thus the Ohio Supreme Court has rejected the premise that the constitution requires a new jury be selected for the sentencing phase of the trial. See, also, State v. Maurer (1984), 15 Ohio St.3d 239. We therefore similarly hold that appellant is not denied effective assistance of counsel when counsel is required to talk about the death penalty during voir dire. As was found in Jenkins, Maurer and Mapes, supra, Ohio courts have not been swayed by the argument that a jury will view counsel as less credible in the event he is forced to present both the guilt and the sentencing phase to one jury or is required to discuss the death penalty prior to the presentation of any evidence.
Appellant's contention that death-qualifying jurors denies him an impartial jury composed of a fair cross-section of the community can also be disposed of by looking toJenkins and Maurer, supra. The Ohio Supreme Court has previously held that "[t]o death-qualify a jury prior to the guilt phase of a bifurcated capital prosecution does not deny a capital defendant a trial by an impartial jury." Maurer, supra
at 244.
Appellant's next constitutional challenge pertains to R.C.2929.03(D)(1). Appellant asserts that pursuant to this section of the Revised Code, once a mental examination is requested for mitigation purposes, appellant has no control over the distribution of the examination results to the jury. Such a procedure is viewed by appellant as a deprivation of his right to effective assistance of counsel in that the report may be viewed by the jury even if the results are not favorable.
 Appellant is in error. In State v. Buell (1986), 22 Ohio St.3d 124, the Ohio Supreme Court held:
 "In issues 9(b) and (c) appellant argues that R.C. 2929.022, 2929.03 and 2929.04 deny effective assistance of counsel and an impartial jury because the mental examination results are made available to all parties including the judge and jury, * * *.
 As properly noted by the appellate court, the defendant decides whether to expose himself to the risk of potentially incriminating presentence investigations, including mental examinations. There is no constitutional infirmity in providing the defendant with such an option. Additionally, the jury should be privy to all information relevant to its task of deciding whether a defendant should be sentenced to life in prison or whether it should recommend that the defendant be put to death." Id. at 137-138.
The above discussion makes it clear that appellant was not denied effective assistance of counsel due to the requirement of a two-phase trial with one jury, the type of voir dire required in a death penalty case, nor the fact that the results of appellant's mental exam were revealed to the jury.
Next, appellant argues that requiring aggravating circumstances to outweigh mitigating factors violates the Ohio and United States Constitutions. Appellant specifically alleges that the use of the term "outweigh" encourages a jury to rely on a standard of proof of preponderance of the evidence when the standard should be "beyond a reasonable doubt." This issue was also addressed by the Ohio Supreme Court inJenkins, supra, where that court stated:
 "An examination of the pertinent statutory provisions which address the subject of mitigating factors demonstrates that the statute does indeed provide the direction that appellant claims is lacking.
 For example, R.C. 2929.03(D)(1) provides, in pertinent part:
 'The defendant shall have the burden of going forward with the evidence of any factors in mitigation of the imposition of the sentence of death. The prosecution shall have the burden of proving, by proof beyond a reasonable doubt, that the aggravating circumstances the defendant was found guilty of committing are sufficient to outweigh the factors in mitigation of the imposition of the sentence of death.'
 This statutory section unambiguously answers appellant's charge as to who bears the burden of proving the existence of mitigating circumstances, by specifically placing the burden on the defendant to go forward with evidence of mitigation. The question remains, however, as to what standard of proof applies to mitigating factors.
 Although the standard is not readily apparent from a reading of R.C. 2929.03 or 2929.04, the Committee Comment to the former R.C. 2929.03
resolves any uncertainty. Therein, it is stated that '* * * [m]itigation must be established by a preponderance of the evidence, * * *.' " Id. at 171.
In the case at bar, the trial court placed the burden of proving mitigating factors by a preponderance of the evidence upon appellant. Thereafter, the state carried the burden of proving that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt. (See Mitigation Hrg. Tr. 396). In light of the case law as well as the discussion of the standard of proof on the record, it cannot be determined that any ambiguity existed.
The next allegation by appellant is that there are no specific or detailed guidelines in the mitigating factors section of the Ohio Revised Code for the jury's use. Appellant's argument may again be disposed of by reviewing the Ohio Supreme Court's decision in Jenkins:
 "Appellant next maintains that the imposition of the death penalty under Ohio's statutory structure is constitutionally infirm for failing to provide necessary and adequate guidance to the sentencing authority in relation to 'weighing' aggravating circumstances and mitigating factors.
R.C. 2929.03(D)(2) provides in relevant part:
 'Upon consideration of the relevant evidence raised at trial, the testimony, other evidence, statement of the offender, arguments of counsel, and, if applicable, the reports submitted pursuant to division (D)(1) of this section, the trial jury, if the offender was tried by a jury, shall determine whether the aggravating circumstances the offender was found guilty of committing are sufficient to outweigh the mitigating factors present in the case. If the jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender. Absent such a finding, the jury shall recommend that the offender be sentenced to life imprisonment with parole eligibility after serving twenty full years of imprisonment or to life imprisonment with parole eligibility after serving thirty full years of imprisonment.'
 Specifically, appellant focuses upon that portion of R.C. 2929.03(D)(2) which requires that the jury weigh aggravating circumstances against mitigating factors which are present in the case, arguing that the 'weighing' process is an inarticulate and amorphous standard which deprived him of his Eighth Amendment protections due to the absence of a discernible legal standard. According to appellant, the constitutional defect arises because the sentencing authority receives no guidance in measuring such disparate factors as aggravating circumstances and mitigating factors beyond the term 'weigh.'
 Appellant's argument is not novel. In Proffitt, supra, at 248, the Florida statute directed that the jury consider '* * * [w]hether sufficient mitigating circumstances exist * * * which outweigh the aggravating circumstances found to exist; and * * * [b]ased on these considerations, whether the defendant should be sentenced to life imprisonment or death.' [Fla. Stat. Ann. Sections 921.141(2)(b) and (c) (1976-1977 Supp.)] * * *.' In his argument before the Supreme Court the petitioner maintained that the weighing process was an inarticulate standard, making it impossible for the sentencing authority to rationally determine whether, in a given case, aggravating circumstances outweigh the mitigating factors.
 In upholding the Florida standard, the court reasoned as follows:
 'While these questions and decisions may be hard, they require no more line drawing than is commonly required of a factfinder in a lawsuit. For example, juries have traditionally evaluated the validity of defenses such as insanity or reduced capacity, both of which involve the same considerations as some of the above-mentioned mitigating circumstances. While the various factors to be considered by the sentencing authorities do not have numerical weights assigned to them, the requirements of Furman are satisfied when the sentencing authority's discretion is guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition.
 'The directions given to judge and jury by the Florida statute are sufficiently clear and precise to enable the various aggravating circumstances to be weighed against the mitigating ones. As a result, the trial court's sentencing discretion is guided and channeled by a system that focuses on the circumstances of each individual homicide and individual defendant in deciding whether the death penalty is to be imposed.' Id. at 257-258.
 In view of the foregoing, we are constrained to reject appellant's argument that by requiring sentencing authorities to 'weigh' aggravating circumstances against mitigating factors, the General Assembly somehow failed to limit the sentencing authority's discretion and focus its attention upon the circumstances of the capital offense and the individual offender when considering whether to return a verdict imposing the death penalty." Id. at 172-173.
Appellant also alleges that Ohio's death penalty statute fails to provide a meaningful basis for distinguishing between life and death sentences since R.C. 2929.03 does not explicitly require the jury, when recommending life imprisonment, to specify the mitigating factor or otherwise identify its reasons for the sentence. Further, appellant feels there is a fundamental flaw in the proportionality review by Ohio courts due to the fact that the law does not require the jury to itemize the mitigating factors found or state why they outweigh the aggravating circumstances. Additionally, the jury is not required to state what aggravating circumstances led to the imposition of the death penalty.
Due to their common link, these allegations will be addressed together. Again, these issues were addressed and disposed of inJenkins where the Ohio Supreme Court stated:
 "In his next contention appellant focuses upon the requirements of R.C. 2929.021, 2929.03 and 2929.05, arguing that the extent of proportionality review in Ohio is constitutionally infirm. In the main, appellant contends that proportionality review in Ohio is flawed since there is no requirement for a jury, when recommending a sentence of life imprisonment over the imposition of the death penalty, to identify the existence of mitigating factors and why those factors outweigh the aggravating circumstances.
 We first observe that appellant's argument that proportionality review is constitutionally required is without merit.
 In Pulley v. Harris (1984), ___ U.S. ___, 79 L.Ed.2d 29, the Supreme Court held that neither Gregg, Proffitt nor Jurek established proportionality review as a constitutional requirement. Id. at 39.
* * *
 Thus, although viewed as commendable, the decision in Pulley demonstrates that proportionality review is not constitutionally required in every case. Other factors which minimize the risk of arbitrary and capricious sentencing include bifurcated proceedings, the limited number of chargeable capital crimes, the requirement that at least one aggravating circumstance be found to exist and the consideration of a broad range of mitigating circumstances. In conjunction with prior United States Supreme Court decisions, the General Assembly incorporated the aforementioned factors into Ohio's death penalty statutes, as well as providing proportionality review — a meaningful function which reduces the arbitrary and capricious imposition of death sentences.
 The question remains whether the absence of a requirement that juries specify the mitigating factors which they found to exist, and why these factors outweigh aggravating circumstances, creates a fatal defect in the statutes. We hold that it does not.
 The fundamental purpose behind proportionality review is to ensure that sentencing authorities do not retreat to the pre-Furman era when sentences were imposed arbitrarily, capriciously and indiscriminately. To achieve this result, state courts traditionally compare the overall course of conduct for which a capital crime has been charged with similar courses of conduct and the penalties inflicted in comparable cases. See Gregg at 204-206, and Proffitt at 259-260.
 The system currently in place in Ohio enables this court to obtain a vast quantity of information with which to effectuate proportionality review, beginning with data pertinent to all capital indictments and concluding with the sentence imposed on the defendant, whether or not a plea is entered, the indictment dismissed or a verdict is imposed by the sentencing authority. See R.C. 2929.021, supra at fn. 13. Although appellant would have this court require juries returning a life sentence to specify which mitigating factors were found to exist and why they outweigh aggravating circumstances, we conclude that such information is not an indispensable ingredient in assisting us to determine whether the imposition of a death sentence is disproportionate to sentences imposed for similarly proscribed courses of conduct." Id. at 174-177.
Appellant's argument that there is a flaw in the proportionality review in Ohio since the court is only required to review cases in which the death penalty was imposed and not other cases where the death penalty might have been imposed has previously been addressed by this court in State v. Hudson,supra and found to be without merit. See, also, State v.Twyford III (September 25, 1998), Jefferson App. No. 93-J-13, unreported; Eley, supra; and State v. Palmer (August 29, 1996), Belmont App. No. 89-B-28, unreported. Hence, appellant's allegations concerning proportionality review, the jury's recommendation and distinguishing between life and death sentences are without merit.
Appellant further alleges that the Ohio Revised Code only requires minimal information be reported to the Supreme Court of Ohio for review. It is appellant's belief that additional data is required for there to be a constitutionally adequate comparison of death penalty cases. This argument focuses upon what is viewed as a lack of information to perform a meaningful review and comparison.
The death penalty statute's proportionality review provision is not unconstitutional when the court reviews only cases where the death penalty was sought. Review need not encompass cases where the death penalty was not sought but could have been sought. See State v. Green (1993), 66 Ohio St.3d 141. Also, the proportionality review mandated by R.C. 2929.05(A) does not require a review of those cases in which a sentence of life imprisonment is imposed rather than the death sentence. SeeState v. Davis (1992), 63 Ohio St.3d 44. It is also clear that proportionality review is restricted to those cases already decided by the reviewing court in which the death penalty has been imposed. See State v. Steffen (1987), 31 Ohio St.3d 111. Furthermore, the Ohio Supreme Court has previously determined on numerous occasions that the scheme established to review and compare death penalty cases is sufficient and constitutional.State v. Moore (1998), 81 Ohio St.3d 22, 39; State v.Davie (1997), 80 Ohio St.3d 311, 328; State v. Benner (1988),40 Ohio St.3d 301, 318. Accordingly, this argument is meritless.
Appellant then alleges that Ohio's death penalty statute is constitutionally deficient since it does not require inquiry into the possible influence of passion, prejudice or other arbitrary factors. This issue was addressed in State v. Scott
(1986), 26 Ohio St.3d 92, where the defendant argued that the appellate review provision of R.C. 2929.05 was constitutionally inadequate because it fails to specifically require findings regarding arbitrariness, passion or prejudice. The court summarily disposed of this contention citing to Jenkins. Id. at 109.
Appellant's final constitutional challenge to Ohio's statutory scheme for imposing the death penalty lies in what he views as a wrongful preclusion of a "mercy option" as a mitigating factor. As noted by both appellant and appellee, this issue has been settled by the Ohio Supreme Court inState v. Lorraine (1993), 66 Ohio St.3d 414, where that court stated:
 "Appellant in his second proposition of law contends that he was denied a fair trial because the trial court refused to instruct the jury concerning mercy and prohibited him from asking the jury to err on the side of mercy.
 This court has previously considered a similar issue. We held in State v. Jenkins (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph three of the syllabus:
 'The instruction to the jury in the penalty phase of a capital prosecution to exclude consideration of bias, sympathy or prejudice is intended to insure that the sentencing decision is based upon a consideration of the reviewable guidelines fixed by statute as opposed to the individual juror's personal biases or sympathies.'
* * *
 Permitting a jury to consider mercy, which is not a mitigating factor and thus irrelevant to sentencing, would violate the well-established principle that the death penalty must not be administered in an arbitrary, capricious or unpredictable manner. Brown, supra, at 541, 107 S.Ct. At 839, 93 L.Ed.2d at 939; Gregg v. Georgia
(1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859; Furman v. Georgia (1972), 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346. The arbitrary result which may occur from a jury's consideration of mercy is the exact reason the General Assembly established the procedure now used in Ohio.
 R.C. 2929.03(D)(2) provides that '[i]f the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender.' (Emphasis added.) This statutory requirement eliminates the subjective state of mind the issue of mercy generally adds to a jury's deliberation.
 Mercy, like bias, prejudice, and sympathy, is irrelevant to the duty of the jurors. Appellant's counsel therefore was not allowed to plead for mercy, although he was permitted to plead for appellant's life based upon the statutory mitigating factors. Accordingly, this proposition is not well taken." Id. at 417-418.
It is not within this court's purview to reverse a decision of the Ohio State Supreme Court on an issue such as has been raised by appellant. Thus, this court will follow the decision in Lorraine and find this issue to be without merit.
Moreover, this court has previously found Ohio's death penalty scheme to be valid. See State v. Grant (November 9, 1990), Mahoning App. No. 83-CA-144, unreported; Hudson, Eley
and Palmer, supra. Hence, as outlined above, it must be concluded that appellant's third assignment of error in all its parts is without merit.
 V. ASSIGNMENT OF ERROR NUMBER FOUR
In assignment of error number four, appellant claims that the trial court should have quashed the indictment due to irregularities in the grand jury selection process. Specifically, appellant alleges that the state failed to adhere to the procedures established in Ohio Revised Code Section 2313 for the creation of the annual jury list, the selection of grand jurors and the excusal of grand jurors.
In the present case the Mahoning County Commissioner of Jurors did not maintain nor file a certified duplicate copy of the jury list with the Clerk of Courts of Common Pleas. Furthermore, appellant alleges that there is no evidence that any grand jurors who were excused were done so in accordance with the Ohio Revised Code mandates. However, appellant does not allege that the annual jury list was improperly compiled nor has he shown any actual prejudice arising from the selection of the grand jury. Appellant argues that since the required information is not available, he is unable to determine if any unconstitutional under-representation of any given group did in fact occur.
 A. APPLICABLE LAW
R.C. 2313.08(A) requires each county to generate a new jury list every year. The statute states that a duplicate of the list must be filed with the clerk of the court of common pleas. R.C. 2313.12 further mandates that the jury commissioners keep records of all persons exempted and the reasons for said exemptions. Procedures for the excuse and discharge of jurors are established by R.C. 2313.13. R.C. 2939.03 states that grand jurors shall be selected, notified, and if applicable, excused according to the procedures established by R.C. 2313.01 et seq.
This identical issue concerning the exact same grand jury panel of names was raised in a prior case from this appellate district which was transferred to Summit County. In the case ofState v. Williams (Nov. 1, 1995), Summit App. No. 16418, unreported, the appellate court held in pertinent part:
 "The record includes the testimony of Edward Barone ('Barone'), a jury bailiff with the Mahoning County Court of Common Pleas. Barone testified that the jury commissioner's office did not file the 1991-92 grand jury list — the list from which the grand jurors in this case were selected — with the clerk of courts. He stated that the list was available in the jury commissioner's office and that the office normally kept the lists for at least two years. Barone also testified that the jury commissioners maintained separate card files of qualified and unqualified jurors, but this information was neither contained in the list nor filed with the clerk of courts.
 The failure to follow the procedures mandated by R.C. 2313.01 et seq. does not require this court to reverse an otherwise valid conviction. If the grand jurors who were impanelled were qualified to be jurors, then any irregularities will be considered nonprejudicial absent a showing that the defendant was prejudiced by the selection process. State v. Fulton (1991), 57 Ohio St.3d 120, 124, certiorari denied (1991), 502 U.S. 828, 116 L.Ed.2d 69-70; Puente, 69 Ohio St.2d at 138.
 We find that the trial court did not err by overruling Williams' motion to quash the indictment. While the Mahoning County jury commissioners did not comply with the literal mandates of R.C. 2313.01 et seq., Barone's testimony indicated that the names of all of the potential grand jurors could have been obtained through the jury commissioner's office. His testimony also indicated that the grand jury list and the card files of qualified and unqualified jurors were maintained for at least two years. Based on this testimony, Williams could have obtained the names of everybody on the grand jury list and could have determined who was and was not qualified.
 The trial court, in its supplemental journal entry overruling Williams' motion to quash, found that the grand jurors who were selected 'possessed the requisite qualifications' to be grand jurors. Williams has not challenged this finding. Williams also has not shown that he was prejudiced by the selection process; instead, he has alleged the possibility that the grand jury was improperly selected. This possibility, in light of Fulton and Puente, does not require us to find that the indictment should have been quashed. Accordingly, we find that the trial court did not err by denying Williams' motion. Id. at 4-5.
This decision was upheld by the Ohio Supreme Court inState v. Williams (1997), 79 Ohio St.3d 1, at page 16.
 B. ANALYSIS
As was the case in Williams, supra, the record in the casesub judice indicates that Edward Barone, the Mahoning County Jury Bailiff, testified that the jury commissioner's office did not file with the Clerk of the Court of Common Pleas the 1991-1992 grand jury list from which the grand jurors in this case were selected. (Voir Dire Tr. 13). However, Mr. Barone stated that the list was available in the grand jury commissioner's office and was kept for approximately two years. (Voir Dire Tr. 14). Furthermore, Mr. Barone testified that the jury commissioner maintained separated card files of the qualified and unqualified jurors. (Voir Dire Tr. 11).
A review of appellant's argument reveals no showing that he was prejudiced in any way by the grand jury selection process. Additionally, all the names of the potential grand jurors were available at the jury commissioner's office and were maintained there for approximately two years. Thus, as inWilliams, supra, the defendant could have obtained the names of every member of the grand jury list to determine qualifications if he so desired. Having failed to do so and show actual prejudice, this court is unwilling and unable to find any error on behalf of the trial court. An assertion of a possibility that irregularities existed in the grand jury selection process, without evidence to substantiate such, is not sufficient to establish error.
Appellant's fourth assignment of error is without merit.
 VI. ASSIGNMENT OF ERROR NUMBER FIVE
The apparent thrust of appellant's fifth assignment of error is two-fold. Appellant begins this assignment of error by focusing on his alleged inability to form the requisite mental intent needed for a conviction of aggravated murder. Under R.C.2903.01, an individual must act "purposely" in order to be convicted of aggravated murder. R.C. 2901.22 defines purposely as acting with a "specific intention to cause a certain result." It is appellant's belief that due to evidence and testimony provided during the mitigation phase of the trial, he has successfully established the state's failure to prove the requisite mental intent element of the crime. Accordingly, we must assess this portion of appellant's argument upon a sufficiency of the evidence standard.
Whether or not the state's evidence is sufficient to support the court's verdict against appellant is a question of law dealing with adequacy. State v. Thompkins (1997), 78 Ohio St.3d 380,386. This court must determine if, "after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Goff
(1998), 82 Ohio St.3d 123, 138, quoting State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus.
In applying the foregoing standard to the case sub judice, it is apparent that appellant's argument rests more upon shadow than it does on substance. He sets forth a premise (i.e. lack of an essential element of the crime) and offers as supportive proof evidence extraneous to the parameters of said premise. That is, counsel for appellant maintains that the trier of fact should not have found appellant guilty of aggravated murder because the defendant did not act "purposely" as contemplated by R.C. 2901.22. In support of this attack on the "guilt" phase of appellant's trial, counsel cites the testimony of several witnesses who testified at the "mitigation" phase of his trial.
Just as one cannot prove the elements of an apple by comparing it with an orange, we cannot utilize mitigation hearing testimony given subsequent to a finding of guilt to show that the determination of guilt was erroneous.Goff, supra, requires this reviewing court to determine whether or not there was sufficient evidence in the record of the essential elements of a crime to support a finding that the appellant was guilty of said crime beyond a reasonable doubt. It is elementary that we must look at the same evidence in the same order as did the trier of fact. Accordingly, the merit of this prong of appellant's argument must rise or fall solely upon the evidence presented at the guilt phase of his trial.
Here, the testimony at the guilt phase of his trial indicates that appellant did in fact act purposefully. For instance, testimony from four witnesses indicated that appellant walked back to his car, obtained a gun and fired into Ms. Richardson's car at close range. Furthermore, both the arresting officers and the interrogating officers found that appellant was coherent and followed directions without any difficulties. This uncontroverted testimony clearly could lead a rational trier of fact to the conclusion that appellant acted "purposely" and thereby intended the end result of causing the death of two individuals. Therefore, appellant has failed to establish that the element of requisite mental intent was not fulfilled.
Appellant also appears to assert under this assignment of error that the evidence provided during the mitigation phase of the trial should preclude the imposition of the death sentence. Appellant points to testimony provided by relatives which indicates that he was subjected to frequent abuse as a child. Additionally, it was established that appellant abused both drugs and alcohol starting at an early age. Two psychologists which appeared during the mitigation phase of the trial on appellant's behalf indicated that this combination of factors placed appellant at a substantial risk of acting out in a violent, inappropriate manner. It was further determined that appellant's low I.Q. and mental deficits impeded his ability to control or appreciate his actions. It is the combination of these factors which leads appellant to believe that the death penalty was inappropriately imposed.
Such an argument by appellant that the mitigating evidence demonstrates that he should not be executed is without merit. Appellant first alleges that his abusive childhood and lack of family support contributed to his inability to act purposely and to appreciate that his actions were criminal in nature. As previously discussed, the evidence presented to the jury was clearly sufficient to conclude that appellant acted purposely. Furthermore, while such factors are to be considered in mitigation, their mere existence does not necessarily outweigh the aggravating circumstance. State v. Rogers (1985), 17 Ohio St.3d 174,187.
Next, appellant offers testimony of his severe alcohol and drug abuse as reason for avoiding the death penalty. The Ohio Supreme Court has repeatedly held that voluntary substance abuse which leads up to the commission of a capital offense deserves little or no weight during the penalty phase.State v. Goff (1998), 82 Ohio St.3d 123, 143; State v. Benge
(1996), 75 Ohio St.3d 136, 147; and State v. Slagle (1992),65 Ohio St.3d 597, 614. Additionally, a defendant's calculated steps in committing the capital offense has been held to refute any claim that the ingestion of cocaine interfered with the "capacity to entertain the purposeful intent to kill." State v.Hill (1995), 73 Ohio St.3d 433, 443. As will be discussed under assignment of error number six, appellant's actions immediately prior to and immediately after the killings support a finding that he was not impaired by any drugs ingested.
Appellant also points to his low I.Q. to demonstrate his lack of capacity to form the requisite mental intent and thus to be sentenced to death. In State v. Rojas (1992), 64 Ohio St.3d 131, the Ohio Supreme Court reiterated its adoption of the United States Supreme Court's determination that mental impairment does not preclude the imposition of the death penalty. In conjunction with appellant's low I.Q., it is argued that additional mental deficits arising from a variety of alleged mental difficulties further impaired appellant's ability to fully appreciate his own actions. Such information was provided by Dr. Mike Hartings and Dr. Wayne Graves, two clinical psychologists who examined appellant. However, such expert testimony, even if uncontroverted, need not be considered conclusive. Testimony from psychiatric experts may very well be so skillfully rebutted via cross-examination and the testimony of lay witnesses that it is determined to merit little weight. State v. Dickerson (1989), 45 Ohio St.3d 206,210-211. Moreover, as has previously been discussed, testimony presented at trial indicated that appellant's acts were voluntary and of such a character as to reflect appellant's awareness of his actions. Testimony also established that appellant was coherent immediately after the shootings.
Appellant concludes this assignment of error by making a brief argument that the death penalty may not be inflicted upon a prisoner who is insane. This argument is without merit as appellant has failed to provide any evidence establishing that he is in fact insane. Furthermore, even if evidence of such had been provided, issues of sanity at the time of execution are not appropriate on direct appeal. In that the imposition of the death sentence in this case has not yet been upheld by the Ohio Supreme Court, this issue is more appropriately addressed after the Ohio Supreme Court has rendered its decision and a definite execution date has been established.
For the foregoing reasons, appellant's fifth assignment of error is without merit.
 VII. ASSIGNMENT OF ERROR NUMBER SIX
Appellant next asserts that the trial court erred in refusing to grant his motion for acquittal pursuant to Crim.R. 29. Appellant's motion was founded upon a belief that the state had failed to prove "prior calculation and design" as required for a conviction of aggravated murder. In support of his position, appellant construes the testimony of the witnesses present at the scene of the killings as establishing that his actions were merely an instantaneous eruption of events. Appellant argues that his actions of walking to his car and retrieving the gun occurred on the spur of the moment and as such are not sufficient to establish a deliberate, contemplated course of action. Having failed to prove the necessary element of "prior calculation and design," appellant asserts that his motion for acquittal should have been granted and the aggravated murder charge should have been reduced.
 A. STANDARD OF REVIEW
As previously discussed under appellant's fifth assignment of error, a determination of whether or not the state's evidence is sufficient to support the court's verdict against appellant is a question of law dealing with adequacy. State v. Thompkins
(1997), 78 Ohio St.3d 380, 386. This court must determine if, "after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Goff (1998), 82 Ohio St.3d 123, 138, quotingState v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
 B. APPLICABLE LAW
Appellant was charged with and convicted of two counts of aggravated murder in violation of R.C. 2903.01(A). Pursuant to the statute, it must be shown that the accused "purposely, and with prior calculation and design, cause[d] the death of another." While "prior calculation and design" has not been statutorily defined, an analysis of relevant case law reveals what is necessary to fulfill this element of the crime of aggravated murder.
It is well settled that in order to meet the "prior calculation and design" element, the accused's actions must be the result of more than mere instantaneous deliberation.State v. Cotton (1978), 56 Ohio St.2d 8, 10. In that momentary deliberation is insufficient to satisfy this element of the crime, ample time must be shown in order for the defendant to develop a scheme to implement the calculated decision to kill.State v. D'Ambrosio (1993), 67 Ohio St.3d 185, 196. Evidence must reveal sufficient time and opportunity to plan the act of homicide. State v. Robbins (1979), 58 Ohio St.2d 74, 79.
Despite the requirement of "sufficient" time, a prolonged thought process is not required. The length of time spent pondering the crime does not in and of itself determine whether the accused acted with "prior calculation and design."State v. Awkal (1996), 76 Ohio St.3d 324, 329. Similarly, the amount of care utilized in completing the crime is not determinative of the issue. D'Ambrosio, supra. So long as the accused's actions amount to more than momentary deliberations, it will be held that he acted with "prior calculation and design." Therefore, it cannot be found that any bright-line test exists which "emphatically distinguishes between the presence or absence of 'prior calculation and design.' " Statev. Taylor (1997), 78 Ohio St.3d 15, 20.
Nevertheless, this court can find guidance on the present issue by analyzing the Ohio Supreme Court's decision inRobbins, supra. The facts in Robbins indicate that the victim and defendant entered into an argument in the hallway of an apartment building. During the course of this argument, defendant struck the victim in the face with his fist thereby knocking him to the floor. Defendant then proceeded into his apartment which was directly adjacent to the hallway and retrieved a large knife. When he returned to the hallway moments later, defendant stabbed and killed the victim.
The Court held that this series of events was in fact adequate to constitute "prior calculation and design." Defendant's withdrawal from the confrontation to obtain a weapon was held to be sufficient time and provided sufficient opportunity to plan the act of homicide. Id. at 79. The Supreme Court has re-affirmed its decision in Robbins as recently as 1997 in the Taylor decision, supra at 22.
 C. ANALYSIS
In analyzing the facts in the case sub judice, this court cannot hold that the trial court erred in denying appellant's motion for acquittal. The testimony and evidence presented provide ample support for finding that appellant had sufficient opportunity to act with "prior calculation and design."
Testimony from Ms. Richardson indicates that Mrs. Gerish left the car occupied by appellant and entered her vehicle in a panicked state. At that time, Mrs. Gerish appeared bruised and bloodied and indicated that her son had thrown her down the steps. From this point on Dewey Avenue, appellant followed Ms. Richardson to the Fast Check store. Testimony from Ms. Richardson as well as three additional independent witnesses indicates that appellant pulled his car up to the driver's side of Ms. Richardson's vehicle. He then exited his vehicle and limped to the passenger's side of Ms. Richardson's car to speak with his mother. All testimony provided fails to establish that any heated argument took place which would instigate an instantaneous eruption of events.
After speaking with his mother, appellant proceeded to the passenger side of his car where he obtained a pistol from the front seat. The record reflects that appellant then turned to the driver's side of Ms. Richardson's car and fired several shots into the interior of the car. He then limped to the passenger's side of the vehicle and again fired repeatedly into the interior of the car. Witness testimony indicates that appellant's final shot was carefully placed and separated in time from all other shots. Every bullet fired into the car struck either Mrs. Thigpen or Mrs. Gerish. Appellant's statements after the shootings indicate that he shot his mother because she was always "nagging." Additionally, appellant reasoned that he had shot Mrs. Thigpen because she had failed to mind her own business. All of this testimony and evidence support a finding that appellant had devised and effectuated a plan which led to the death of two individuals.
Despite appellant's contention that no "great time elapsed,"D'Ambrosio and Awkal, supra stand for the proposition that neither the time taken pondering the crime nor the care taken in completing it are determinative of "prior calculation and design" so long as more than momentary deliberation can be established. At the very least, the evidence and testimony of record support a finding that appellant had established a plan to kill both women prior to completing his conversation with Mrs. Gerish at the passenger's side of the vehicle. This is evidenced by appellant's slow, deliberate return to the passenger's side of his vehicle to retrieve the gun from the front seat. Had appellant not planned to kill these women, he could have returned to the driver's side of his car to leave the parking lot. Furthermore, appellant's statements as to his reasons for killing the women reflect a rationalized, thought-out decision.
Appellant's actions mirror those present in theRobbins case. Appellant departed from his conversation to obtain a weapon located a short distance away. Upon retrieving his weapon, appellant approached the vehicle containing the victims and put his plan into effect. The time frame established and the distance traveled provided ample opportunity to fulfill the "prior calculation and design" element. No evidence or testimony can be found of record to illustrate an eruption of events or explosive scenario which caused appellant to instantaneously act out in a violent manner. On the contrary, the record reflects voluntary, deliberate actions on behalf of appellant.
Appellant's attempt to analogize the present situation to the facts in State v. Davis (1982), 8 Ohio App.3d 205, is without merit. The facts in Davis are clearly distinguishable. In that case, the defendant went to a bar, admittedly without any animosity toward anyone present at the establishment. However, upon arrival he was refused admittance. A verbal argument escalated into a physical confrontation between the defendant and three people from within the bar. At the point appellant became outnumbered and began receiving the worse of the treatment, he pulled a gun from his pocket and opened fire. The court in this decision held that these acts were not sufficient to constitute "prior calculation and design." Id. at 207.
As is clear from the facts in Davis, at no point in time did the defendant retreat from the situation to obtain a weapon. Additionally, he had no pre-conceived animosity toward any of the people at the bar. Rather, the events which transpired were an obvious instantaneous eruption. Such is not the case at bar where appellant did in fact have definite animosity toward the victims, retreated from the situation to retrieve a weapon and had sufficient opportunity to develop a scheme.
As required when considering any motion for acquittal, the evidence before the trial court has to be considered in a light most favorable to the state to determine whether any rational trier of fact could determine that the element of "prior calculation and design" was established. In consideration of the evidence and testimony of record, it cannot be held that the trial court erred in denying appellant's motion. The overwhelming effect of the evidence in fact supported a finding that appellant had acted with "prior calculation and design."
Therefore, appellant's sixth assignment of error is held to lack merit.
 VIII. ASSIGNMENT OF ERROR NUMBER SEVEN
Appellant next alleges that the trial court erred in permitting the readmission of certain exhibits, primarily photographs, from the guilt phase of the trial into the mitigation phase. Appellant makes a general assertion that all of the photographs and exhibits introduced were irrelevant as well as repetitive and cumulative in nature. Furthermore, appellant believes these exhibits served solely to inflame the passion of the jury and were therefore prejudicial in nature.
 A. APPLICABLE LAW
In the case sub judice, appellant was found guilty of aggravated murder in that his actions fulfilled the aggravating circumstance set forth in R.C. 2929.04(A)(5) which states in relevant part:
 "* * * the offense at bar was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender."
In order to have the death penalty imposed, R.C. 2929.04(A) requires that the aggravating circumstance be proven beyond a reasonable doubt. Furthermore, the state has the burden of establishing during the second phase of the trial that the aggravating circumstance outweighed any mitigating factors.
The Ohio Supreme Court has repeatedly cited to its holding inState v. DePew (1988), 38 Ohio St.3d 275, when addressing the appropriateness of introducing evidence and testimony from the guilt phase of the trial into the mitigation phase. The Court stated in relevant part in its opinion:
 "Lastly, appellant argues that the trial court erred in submitting all these photographs to the jury in the penalty phase. In his instructions at this stage, the trial judge stated that '[t]he Court is going to place in your possession the exhibits which the Court admitted into evidence during the course of both trials * * *.' Citing Thompson, supra, appellant argues that these photographs were relevant to guilt, not to the appropriate penalty, and that permitting the jury to view the photographs again served no purpose but to inflame their passions against appellant.
* * *
 In fact, we find that the introduction of photographs, even if gruesome, in the penalty stage is not error and is indeed authorized by R.C. 2929.03(D)(1), which provides in part that during the penalty stage, the court and the trial jury shall consider '* * * any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing * * *.' In addition, this section provides that the court and the trial jury '* * * shall hear testimony and other evidence that is relevant to the nature and circumstances of the aggravating circumstances the offender was found guilty of committing * * *.' (Emphasis added.)
* * *
 The courts of this state have been required to wrestle with the question of what evidence is appropriate for the prosecution to introduce at the penalty stage. We now hold that, pursuant to R.C. 2929.03(D)(1), the prosecutor, at the penalty stage of a capital proceeding, may introduce '* * * any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing * * *.' While this appears to permit repetition of much or all that occurred during the guilt stage, nevertheless, a literal reading of the statute given to us by the General Assembly mandates such a result, especially in light of the prosecution's obligation to demonstrate, by proof beyond a reasonable doubt, that the aggravating circumstances the defendant was found guilty of committing are sufficient to outweigh the factors in mitigation. R.C. 2929.03(D)(1)." Id. at 282-283.
The Supreme Court has continued to rely upon this reasoning as is evidenced in State v. Mason (1998), 82 Ohio St.3d 144. The Court again determined that a "prosecutor at the penalty phase may introduce any evidence from the guilt phase relevant to the aggravating circumstances." Id. at 165. Similarly, the Supreme Court has held that it is appropriate to admit all exhibits from a trial's guilt phase as such are related to the death specification and the nature and circumstances of the offense. State v. Woodard (1993), 68 Ohio St.3d 70, 78.
 B. ANALYSIS
The following exhibits were entered into evidence during the mitigation phase of this trial over the objection of the defense: Exhibits 13, 16, 17, 21, 22, 27 thru 32, and 34 thru 41. These exhibits are as follows:
 1. Exhibit 13: A photo of Mrs. Thigpen lying between the seats of the automobile.
 2. Exhibit 16: A photo of Mrs. Gerish with a bullet wound to her forehead.
 3. Exhibit 17: A closeup of the entrance wound to Mrs. Gerish's cranial cavity.
 4. Exhibit 21: The coroner's autopsy report in the death of Mrs. Thigpen.
 5. Exhibit 22: A copy of the emergency room record concerning Mrs. Thigpen.
 6. Exhibit 27: A copy of the emergency room record concerning Mrs. Gerish.
 7. Exhibit 28: The coroner's autopsy report in the death of Mrs. Gerish.
 8. Exhibit 29: A photo of Mrs. Thigpen showing one gunshot wound to the posterior chest.
 9. Exhibit 30: A photo of Mrs. Thigpen showing an entrance wound through the thorax injuring the heart.
 10. Exhibit 31: An x-ray of Mrs. Thigpen showing another bullet that entered her left chest.
 11. Exhibit 32: Appellant's waiver of Miranda rights which was attested to by the investigating detective.
 12. Exhibit 34: A photo of Mrs. Gerish in the morgue showing a bullet wound to her head.
 13. Exhibit 35: A photo of Mrs. Gerish showing two different wounds as well as soft tissue trauma.
 14. Exhibit 36: A photo of Mrs. Gerish showing a non-fatal left shoulder wound and another to the back of the ear.
 15. Exhibit 37: An x-ray showing three of the bullet wounds in Mrs. Gerish.
16. Exhibit 38: A skull x-ray of Mrs. Gerish.
 17. Exhibit 39: A photo of Mrs. Gerish's frontal view showing where the bullet ended.
 18. Exhibit 40: A photo of Mrs. Gerish showing three bullet wounds, two of which caused her immediate demise and one of which would have been lethal had Mrs. Gerish survived long enough. (Tr. 371).
 19. Exhibit 41: A photo of four wounds with the wound to the left shoulder being finally visible. (Tr. 272).
A review of these exhibits reveals that they all serve to illustrate the nature and circumstances of the aggravating circumstance that appellant was found guilty of committing. As a result, all such exhibits are admissible. As previously discussed, the aggravating circumstance at issue requires that appellant purposefully killed two individuals during the same course of conduct. All information relevant to this circumstance is admissible in order to support the state's argument that the aggravating circumstance outweighs any mitigating factors.
In regards to the photographs of the two victims, these exhibits serve a dual purpose. First, they reveal the cause of death of the individuals. Second, they go to the purposeful element of the aggravating circumstance. By indicating the multiple wounds to the victims, the photographs illustrate appellant's intent to kill both victims. Evidence of this sort has previously been held to be relevant as to the nature and circumstances of the aggravating circumstance. State v. Smith
(1997), 80 Ohio St.3d 89, 109.
All medical records and pathological evidence contained in the exhibits again goes to support the cause of death of the victims. Furthermore, these exhibits may be used to support the intent of appellant due to the fatal nature of a number of the wounds. Finally, any exhibit related to appellant's confession further supports a finding that appellant acted intentionally in killing the two victims.
Since all exhibits which were objected to clearly relate to the aggravating circumstance as well as the nature and circumstances thereof, it cannot be determined that the trial court erred in permitting the exhibits to be introduced during the mitigation phase of the trial. All exhibits fall within the scope of admissible evidence as established by R.C.2929.03(D)(1) and the case law interpreting said statute. Therefore, it cannot be held that any of these exhibits served to prejudice appellant. All exhibits were properly introduced to assist the state in meeting its burden regarding the aggravating circumstance.
For the foregoing reasons, appellant's seventh assignment of error is without merit.
 IX. ASSIGNMENT OF ERROR NUMBER EIGHT
In appellant's final assignment of error, he alleges that cumulative error throughout the guilt and mitigation phases denied him his right to a fair trial in violation of the U.S. Constitution, Amendments VI and XIV, and the Ohio Constitution, Art. I, § 10. Specifically, appellant objects to the introduction of photographs of the victims when they were still in the automobile where they were shot as well as photographs of the victims taken by the coroner during the autopsy. Appellant feels that since appellant had admitted to shooting his mother and Mrs. Thigpen, the admission of those photos was improper and the probative value did not outweigh the danger of prejudice due to the gruesomeness of the contents of the photographs. Furthermore, appellant feels the photographs admitted into evidence were repetitive and cumulative in nature.
While appellant generally objects to all of the photographs admitted into evidence, he only makes specific objection in his brief to exhibits 11 and 12. These exhibits depict the car as located at the scene of the shootings. Essentially, appellant argues that the photographs admitted into evidence were gruesome, irrelevant and cumulative in character. As such, appellant finds error in the trial court's decision to admit them into evidence.
 A. APPLICABLE LAW
The determination of the admissibility of photographic evidence rests within the sound discretion of the trial court.State v. Slagle (1992), 65 Ohio St.3d 597, 601. Therefore, the trial court's decision on such matters will be upheld on appeal absent an abuse of discretion. Id. at 602. Guidance has frequently been provided by the Ohio Supreme Court to assist the trial courts in determining what steps must be taken to avoid being overturned on appeal.
Photographs of the bodies as well as the crime scene are admissible so long as they are relevant and the danger of material prejudice to the defendant is outweighed by the probative value of the evidence. State v. McGuire (1997),80 Ohio St.3d 390, 395, citing State v. Maurer (1984), 15 Ohio St.3d 239,266. Furthermore, even photographs which are considered gruesome in nature are admissible in capital cases if their probative value is determined to outweigh the chance of prejudice. State v. Phillips (1995) 74 Ohio St.3d 72, 77, citing Maurer, supra. As to the issue of repetitiveness, the Court has held that in situations where the photographs are not particularly gruesome, "it is difficult to imagine how the sheer number of photographs admitted can result in prejudice requiring reversal." State v. Allen (1995),73 Ohio St.3d 626, 636, citing State v. DePew (1988), 38 Ohio St.3d 275,281.
The Ohio Supreme Court has further provided numerous examples of when photographs are particularly probative and thus likely to be admitted into evidence. Photographs which clarify testimony regarding the number, type and placement of wounds have significant probative value which negates any potential prejudice to the defendant. Allen, supra. Additionally, photographs which illustrate the testimony of the coroner, police or other relevant witnesses have been held to carry sufficient probative weight to overcome any potential prejudice. State v. Moore (1998), 81 Ohio St.3d 22, 32. Finally, in State v. Davis (1991), 62 Ohio St.3d 326, it was held that photographs which illustrate the purposeful intention behind the murders are significantly probative in character.Id. at 348.
As to the issue of cumulative error, a conviction will be reversed where the cumulative effect of errors during the course of a trial deprives a defendant of the constitutional right to a fair trial despite the fact that each error individually does not constitute cause for reversal.State v. DeMarco (1987), 31 Ohio St.3d 191, 196-197. However, the doctrine of cumulative error is not applicable in the event the appellant fails to establish multiple instances of harmless error during the course of the trial. State v. Garner (1995),74 Ohio St.3d 49, 64.
 B. ANALYSIS
A review of the photographs admitted into evidence fails to reveal any abuse of discretion on behalf of the trial court. As previously explained, appellant makes specific mention of exhibits 11 and 12 while making a general objection to the remaining photographs. An examination of exhibits 11 and 12 reveals that both photographs show different views of Ms. Richardson's car as it was positioned at the crime scene. Neither of these photographs could be excluded from evidence on the basis that they were gruesome as they merely show the automobile as situated in the parking lot. While the victims are in the vehicle, they are not visible in the photographs as a sheet was placed over their bodies. Furthermore, the distance and the angle in which the photographs were taken do not provide a view of the interior of the vehicle. As such, the trial court cannot be viewed as abusing its discretion in admitting these two exhibits.
Both photographs illustrate the testimony of witnesses as related to the manner in which the vehicle entered the parking lot and came to a rest. Additionally, photographs of crime scenes are generally admissible into evidence.McGuire, supra. In light of the relevance of the photographs and the absence of any gruesome content, they were properly admitted.
While appellant failed to indicate which of the remaining exhibits were objectionable and on what grounds, a review of the photographic exhibits finds that none were improperly admitted by the trial court. The remaining exhibits and their admissibility can be compared to the admission of exhibits inState v. Davis (1991), 62 Ohio St.3d 326. In Davis, the Ohio Supreme Court was faced with an analogous situation regarding the admissibility of numerous photographs of the victims. As in the case sub judice, the appellant made general allegations as to the gruesome and inflammatory nature of the photographs without specifying which photographs in particular were objectionable. The photographs presented provided numerous shots of the victim's faces revealing blood and edema. While some of the photographs were of the same area of the body, they were taken from different angles and distances.
The Court held that all photographs were properly admitted as they illustrated the "purposeful intention behind the murders and support[ed] the testimony of the witnesses on the scene and the coroner." Id. at 348. Furthermore, while some of the photographs were repetitive, the Court held that this alone would not constitute reversible error unless the defendant could show actual prejudice. Id.
As in Davis, appellant makes the same blanket allegations regarding the photographs without specifying which exhibits were objectionable, on what grounds they were objectionable and what prejudices resulted from their admission. However, a review of the photographs finds that any prejudice which may have resulted was far outweighed by the probativeness of each individual picture. The various photographs of the victims, both in the car and at the autopsy, clearly depict the number, type and placement of the wounds. Such evidence not only illustrates the appellant's purposeful intention which is at issue but also supports the testimony of the coroner. Davis,supra. In that appellant has focused his argument on the intent element of the crime, exhibits which shed light on the purposefulness of appellant's actions are strongly probative. Said probativeness outweighs any prejudice which may have resulted from the introduction of the photographs.
On the issue of the gruesomeness of the photographs, the trial court correctly found that none of the photographs were so gruesome that the danger of prejudice outweighed their probative value. While the photographs did depict the bodies of the victims lying in the automobile, they did not contain views of excessive blood, disfigurement or the like. The photographs which were admitted merely illustrated the number, type and placement of the wounds which has previously been determined to be quite probative. See Allen, supra. Moreover, they illustrate the purposeful brutality of the murder and support witness testimony. The extent of the probative value of the photographs again must be determined to outweigh any prejudice which may have resulted. While some of the photographs may have shown the same victim, they were taken from different angles and distances. As seen in Davis, numerous photos of the same victim in and of itself is not sufficient to warrant reversal.
Since appellant's final assignment of error, along with the other assignments of error were found to be without merit, the doctrine of cumulative error cannot be held to be applicable. As appellant has failed to establish multiple instances of even harmless error during the trial, this court cannot find that cumulative error denied appellant a fair trial.Garner, supra.
For the foregoing reasons, appellant's eighth assignment of error lacks merit.
 X. INDEPENDENT REVIEW
R.C. 2929.05(A) provides that after an appellate court has reviewed and analyzed a death penalty judgment in the same manner as it would a judgment in any other type of criminal case, the court is further required to independently review the evidence presented at trial and determine if the imposition of the death penalty was warranted. As such, we will now proceed with said independent review to determine if the imposition of the death penalty was warranted.
Under R.C. 2929.05(A), an appellate court's independent review of the imposition of the death penalty involves a three-step process. First, we must review the record to determine whether the evidence supports the finding that the aggravating circumstance was established beyond a reasonable doubt. Second, we must reweigh all the evidence presented at trial to determine if the aggravating circumstance outweighs the mitigating factors. Third, we are required to decide if the imposition of the death penalty in this case was disproportionate or excessive in comparison to other cases in which the death penalty has previously been imposed.
In addressing the first step of our independent review, we note that the sole specification under each aggravated murder count charged appellant with the aggravating circumstance delineated in R.C. 2929.04(A) (5). Under this section of the Ohio Revised Code, criteria are defined which must be met prior to imposing the death penalty for aggravated murder. The statute states in relevant part:
 "(A) Imposition of the death penalty for aggravated murder is precluded, unless one or more of the following is specified in the indictment or count in the indictment pursuant to section 2941.14 of the Revised Code and proved beyond a reasonable doubt:
* * *
 (5) Prior to the offense at bar, the offender was convicted of an offense an essential element of which was the purposeful killing of or attempt to kill another, or the offense at bar was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender."
The indictment in this case, in specification to counts one and two reads, "The Grand Jury further finds and specifies that the offense at bar was part of a course of conduct involving the purposeful killing of, or attempt to kill, two or more persons by John Steven Gerish, contrary to R.C. 2929.04 (A) (5)." While appellant in this case has admitted that he killed both Mrs. Gerish and Mrs. Thigpen, the issue we must address is whether those killings were proven beyond a reasonable doubt to have been committed purposefully.
Essentially, this portion of our independent review can be disposed of by referencing our argument addressing appellant's fifth assignment of error. Under his fifth assignment of error appellant alleged that he was unable to form the requisite mental intent needed for a conviction of aggravated murder. Specifically, appellant argued that his condition at the time of the killings prevented him from acting purposely. In disposing of this assignment, we determined that the evidence and testimony presented supported a finding that appellant acted purposely in killing the two victims.
As defined under R.C. 2901.22, an individual acts with purpose when he acts with a "specific intention to cause a certain result." The voluntariness of appellant's actions, his statements to police and his demeanor during as well as following the incident supported a finding that appellant acted purposely in killing both victims. No evidence supports a finding that appellant acted on an impulse or that the killings were the result of an instantaneous eruption of events. Appellant's actions and statements in conjunction with the manner in which he killed both victims indicates he acted with purpose. Therefore, it must be held that the evidence supports beyond a reasonable doubt a finding that appellant purposefully murdered Ann Gerish and Eva Thigpen as part of a course of conduct as provided for in R.C. 2929.04 (A) (5).
Having determined that the aggravating circumstance was established beyond a reasonable doubt, this court now turns its focus to the second step of its independent review. We must now determine whether the aggravating circumstance outweighs any mitigating factors established by appellant. R.C. 2929.04 (B) sets forth a specific list of factors which must be considered in favor of the defendant if they are proven by the evidence:
 "(1) Whether the victim of the offense induced or facilitated it;
 (2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;
 (3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law;
(4) The youth of the offender;
 (5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;
 (6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;
 (7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death."
In addition to the foregoing factors, R.C. 2929.04(B) provides that the history, character and background of the defendant can be weighed against the aggravating circumstance along with the nature and circumstances of the offense. However, in relation to the latter consideration, an appellate court is not always required to consider the nature and circumstances of the offense in favor of the defendant. The Ohio Supreme Court has held that, when the facts of a specific case so warrant, the nature and circumstances of the offense can be cited as supporting the finding that the aggravating circumstance outweighs the mitigating factors. State v.Moreland (1990), 50 Ohio St.3d 58, 69. Furthermore, the trial court need not give mitigating weight to an offender's history, background and character if it finds said factors do not warrant such weight. State v. Green (1993), 66 Ohio St.3d 141,150.
We are mindful that only the aggravating circumstances may be weighed against the mitigating circumstances. State v. Davis
(1988), 38 Ohio St.3d 361, 367-373. Further, the mitigating circumstances must be considered collectively, State v.Dickerson (1989), 45 Ohio St.3d 206, 213, and all mitigating evidence must be considered. State v. Lawrence (1989), 44 Ohio St.3d 24,27.
Based on our review of the record, factors one, two, four five and six as set forth in R.C. 2929.04(B) are inapplicable to the instant action. There was no evidence introduced to show that either victim induced or facilitated these murders. [R.C.2929.04 (B)(1)]. Additionally, there was no evidence submitted to illustrate that appellant was under any duress, coercion or strong provocation at the time of the killings. [R.C. 2929.04
(B) (2)]. At the time of the murders, appellant was of such an age as to make the fourth mitigating factor irrelevant. [R.C.2929.04 (B) (4)]. Appellant did not present any evidence which would cause this court to find the fifth mitigating factor applicable as related to the lack of a significant history of prior convictions. [R.C. 2929.04 (B) (5)]. On the contrary, this mitigating factor is rendered irrelevant in light of appellant's prior incarceration on a manslaughter charge. Due to the fact that appellant was the only participant in the killings, the sixth mitigating factor warrants no weight either. [R.C. 2929.04(B)(6)].
In regards to the third mitigating factor, appellant introduced testimony from two clinical psychologists in an attempt to establish that at the time of the offense he lacked substantial capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law. Dr. Wayne J. Graves testified that in addition to being borderline mentally retarded, appellant suffered from generalized anxiety disorder, organic amnestic disorder and polysubstance abuse. As a result of these disorders, Dr. Graves opined that appellant lacked the capacity to appreciate what he was doing at the time of the killings. Appellant also provided testimony from Dr. Michael Hartings in an attempt to establish this mitigating factor. Dr. Hartings indicated that appellant suffered from alcoholic dementia which affected his ability to control his own actions.
A review of the record finds substantial evidence to decrease any weight which this mitigating factor may be given. First, on cross-examination Dr. Graves conceded that he found appellant to be manipulative during the interviews. Furthermore, he found appellant to be logical and lucid in all responses. Lastly and perhaps most important, we find no credible evidence that reasonably suggests that appellant acted impulsively and thus, was substantially unable to control his behavior at the time of the murders. It is this court's judgment that the nature and circumstances of the offense indicate a lack of impulsive behavior during or immediately after the killings. As has been addressed previously, appellant's actions leading up to the death of the two individuals supports a finding that he acted voluntarily and purposely. Appellant's actions and statements after the killings further support this conclusion. Nonetheless, in light of the formal diagnoses made by Dr. Graves and Dr. Hartings, we will assign this mitigating factor some minimal weight.
Under R.C. 2929.04 (B) (7) (the catchall provision) we will consider appellant's childhood history, substance abuse and I.Q. During the mitigation phase, appellant offered testimony from his sister, an aunt, a cousin and a niece in an attempt to relate to the jury the difficulty he experienced as a child. Through this testimony it was established that appellant had been physically abused by both his mother and father throughout his childhood. Additionally, testimony was provided which indicated that appellant began to abuse alcohol at a very young age. Eventually, appellant's substance abuse expanded to include marijuana and cocaine. Testimony and evidence was also provided by appellant to substantiate his low intelligence.
While an appellant's history and background relating to an abusive childhood must be considered, they need not necessarily be afforded significant weight. This proposition is clearly illustrated in State v. Rogers (1985), 17 Ohio St.3d 174, when the Ohio Supreme Court held:
 "During the sentencing phase of his trial appellant presented evidence of the following mitigating factors: (1) his twelve-year institutionalization from age ten to age twenty-two, (2) his mental retardation, (3) his limited (third grade) education, (4) his limited ability to read and write, (5) his lack of familial support, and (6) his history of alcoholism. After careful consideration of the cumulative effect of these mitigating factors on appellant at the time he took the life of Lisa Bates, we can come to no other conclusion than that these factors do outweigh the heinous nature of the aggravating circumstances surrounding her murder." Id. at 187.
Furthermore, the Ohio Supreme Court has consistently held that an individual's voluntary substance abuse deserves minimal weight as a mitigating factor. State v. Goff (1998), 82 Ohio St.3d 123,143. As to appellant's I.Q., the Ohio Supreme Court has previously held that mental impairment does not preclude the imposition of the death penalty. See State v. Rojas (1992),64 Ohio St.3d 131. As a result, we cannot find that any of the mitigating factors which have been collectively addressed under R.C. 2929.04(B)(7) are deserving of more than minimal mitigating weight.
In considering the nature and circumstances of the offense, we do not find anything of record which would weigh in favor of mitigation. In fact, the nature and circumstances of the offense support a finding that the aggravating circumstance outweighs the mitigating factors. As has been addressed on numerous occasions, the events surrounding the killings support a finding that appellant acted purposely and without significant provocation. The evidence does not indicate that appellant acted impulsively or without knowledge of what was transpiring.
R.C. 2929.04(C) states, in relevant part:
 "The existence of any of the mitigating factors listed in division (B) of this section does not preclude the imposition of a sentence of death on the offender, but shall be weighed pursuant to divisions (D) (2) and (3) of section 2929.03 of the Revised Code by the trial court, trial jury, or the panel of three judges against the aggravating circumstances the offender was found guilty of committing."
In summation, this court accords little weight to the evidence appellant submitted concerning the mitigating factors set forth in R.C. 2929.04 (B) (3) and (7). Similarly, appellant's history, character and background offer little in the way of mitigating weight. In contrast, we accord considerable weight to the sole aggravating circumstance and the nature and circumstances of the crime. Consequently, we ultimately find beyond a reasonable doubt that the sole aggravating circumstance of appellant's purposeful taking of two innocent lives outweighs the cumulative effect of all relevant mitigating factors.
Under the final step of this analysis, this court is required to determine if the imposition of the death penalty in the instant case is excessive or disproportionate in comparison to other death penalty cases. While this court has previously rendered decisions in six capital cases, none of these prior cases can be deemed similar to the case sub judice.
For instance, in State v. Rosalie Grant (Nov. 9, 1990), Mahoning App. No. 83-CA-144, unreported, this court affirmed the conviction and death sentence of a woman convicted of the purposeful killing of her two children during an aggravated arson.
In State v. Hudson (May 29, 1993), Jefferson App. No. 88-J-40, unreported, Hudson had been convicted of the kidnaping and purposeful killing of another man. The facts showed that Hudson and three other men lured the victim from his home by telling him that a friend needed his help, then drove the victim to a remote area where he was beaten, stabbed and shot. On appeal, this court reversed Hudson's death sentence.
In State v. Eley (Dec. 20, 1995), Mahoning App. No. 87-CA-122, unreported, this court affirmed the death sentence of defendant after his conviction of aggravated murder with a death penalty specification that the murder was committed during or immediately after the commission of an aggravated robbery. The defendant killed the owner of a grocery store during a robbery attempt committed with the assistance of an accomplice.
In State v. Palmer (Aug. 29, 1996), Belmont App. No. 89-B-28, unreported, this court affirmed the death sentence of defendant after his conviction on two counts of aggravated murder with the death penalty specification that the murders were committed during the course of aggravated robbery. The defendant and an accomplice murdered and robbed two victims leaving their bodies along a roadside.
In State v. Spivey (Jan. 13, 1997), Mahoning App. No. 89-CA-172, unreported, this court affirmed the death sentence of defendant after his conviction of aggravated murder with the death penalty specification that the murder was committed during the course of an aggravated burglary, aggravated robbery and grand theft of a motor vehicle. Mr. Spivey broke into an individual's home, stabbed her and brutally beat her to death before robbing the house and fleeing the scene in the victim's automobile.
In State v. Raymond A. Twyford, III (Sept. 25, 1998), Jefferson App. No. 93-J-13, unreported, Twyford and another man were convicted of the kidnaping, robbery and murder of a man. Twyford had deceived the individual into believing that he was going hunting. The defendants mutilated the body of the victim before disposing of it. This court affirmed Twyford's death sentence.
Although two of the above cases involve multiple murders, (i. e. Grant and Palmer), none involved the situation where the multiple-murder aggravating circumstance under R.C. 2929.04 (A) (5) was the sole aggravating circumstance. Thus, we find that none of these cases are sufficiently similar so as to suffice for proportionality purposes. Therefore, we must look to similar cases decided by the Ohio Supreme Court.
Since 1986, the Supreme Court has reviewed numerous death penalty cases where the multiple-murder aggravating circumstance under R.C. 2929.04(A) (5) was the only circumstance present. See State v. Brooks (1986), 25 Ohio St.3d 144; State v. Bedford (1988), 39 Ohio St.3d 122; State v.Sewell (1988), 39 Ohio St.3d 322; State v. Lawrence (1989),44 Ohio St.3d 24; State v. Coleman (1989), 45 Ohio St.3d 298;State v. Moreland (1990), 50 Ohio St.3d 58; State v. Combs
(1991), 62 Ohio St.3d 278; State v. Williams (1996), 74 Ohio St.3d 569
and State v. Awkal (1996), 76 Ohio St.3d 324.
Out of the above cases, the Supreme Court has affirmed the death penalties in all but one. In many of those cases, the defendant was either under significant emotional stress or lacked substantial capacity to conform his conduct to the law due to mental illness or defect. See Moreland and Awkal. In addition, like the appellant, the defendants in Moreland andAwkal could point to bad childhoods in an attempt to establish mitigating evidence.
In Lawrence, the Supreme Court found that the mitigating factors outweighed the single multiple-murder aggravating circumstance and, therefore, vacated the death sentences. However, the mitigating factors in Lawrence included provocation, post-traumatic stress disorder rising to the level of a diminished-capacity mitigating factor under R.C. 2929.05
(B) (3), a severe depression following the death of the defendant's infant son, lack of a significant history, the defendant's voluntary military service and care for his family. In comparison, the mitigating factors in this case are nearly nonexistent.
In all of the remaining cases decided by the Supreme Court, all the defendants submitted mitigating evidence similar to that submitted by appellant herein, i. e. troubled and/or abusive childhoods, problems with drugs and/or alcohol, possible mental problems, etc., and the death sentences were upheld by the Ohio Supreme Court.
Based upon the foregoing, we find that under R.C. 2929.05 the death sentence imposed upon appellant herein is not disproportionate to the penalty imposed in similar cases decided by the Ohio Supreme Court. Therefore, the death penalty was appropriate and the judgment of the trial court is affirmed.
Cox, P. J., concurs.
Waite, J., concurs.
APPROVED:
 ---------------------------- JOSEPH J. VUKOVICH, JUDGE